---

(76 Misc. Rep. 137.)

### In re VAN DEN HEUVEL'S WILL

#### (Surrogate's Court, New York County. March, 1912.)

1. WILLS (§ 55*)—INCOMPETENCY OF TESTATRIX—EVIDENCE.

Where one is incompetent and is treated as such by her family, the fact that she signs checks and other formal papers which are not dispositive in character does not disprove the incompetency established.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

2. WILLS (§ 52*)—PROBATE—BURDEN OF PROOF.

The burden of proving the affirmative is always on the proponents throughout a testamentary cause.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 101–110; Dec. Dig. § 52.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. WILLS (§ 52*)—PROBATE—BURDEN OF PROOF.

Where the incompetency of a testatrix is shown, it is presumed to continue, and the proponents of her will must satisfy the surrogate that the instrument is her free, conscious, and deliberate act, and the burden is on the proponents to show that the will was made in a lucid interval.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 101–110; Dec. Dig. § 52.*]

4. WILLS (§ 55*)—PROBATE—SUFFICIENCY OF EVIDENCE.

Where a proceeding instituted in 1900 to sequestrate the estate of a woman over 70 years old, who was suffering from senile dementia and delusions of persecutions, was abandoned after preparation of the papers, and as a substitute her family engaged a person from a hospital for mental derangements who guarded and cared for the woman, who thereafter occasionally indorsed dividend checks and other formal papers till her death in 1910, an instrument executed in 1903 will be denied probate as her will as not supported by evidence of the capacity of the testatrix at the time of its execution.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

Proceedings to probate the will of Charlotte A. Van Den Heuvel. Decree entered.

Strong & Cadwalader, for temporary administrator and for George W. Wickersham, the executor of the will of 1896 and codicil thereto.

Edward De Witt, for Daisy Field's children.

Arthur P. McKinstry, for Julia L. Bibby, Emma M. Cooper, Paul L. Motteley, Ethel L. Barrett, and Marie L. Strong.

Russell S. Wolfe, for Marie Fisher.

J. Mayhew Wainwright, for American Society for the Prevention of Cruelty to Animals.

John F. Charlton, for Association for Improving the Condition of the Poor.

Frederick de P. Foster, for Amelia Foulke.

M. F. McGoldrick, for Charles F. M. Stark.

Swanstrom & Keyes (G. W. Wingate, of counsel), for Mr. Raymond, executor.

House, Grossman & Vorhaus (Joseph M. Hartfield, of counsel), for Carolina Koch.

F. E. Barnard, for John C. L. Hamilton.

Edward R. Vollmer, for Henry M. Hamilton, Alexander Hamilton, Adelaide Hamilton, William G. Hamilton, Alexander Hamilton, Jr., Henry N. Hamilton, Marie Louise Henderson, Schuyler V. C. Hamilton, Gertrude Ray Hamilton, and Gertrude Baroness de Graffenried, as general guardian of Violet L. Hamilton, an infant.

Murray, Bennett & Ingersoll, for Mary A., George P., and Colin M. Ingersoll.

Romer & Harrington, for Edgar A. Hamilton, individually.

Louis O. Condit, for Emma G. Hamilton, Fletcher H. Montgomery, and Henry States, guardians of Alexandra S. Hamilton.

Knox & Dooling, for Messiah Home for Children.

W. Gibbes Whaley, for petitioner.

Michael J. Egan, special guardian.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

FOWLER, S. This is a consolidated proceeding for the probate of the last will and testament of Charlotte A. Van Den Heuvel. There are three petitions for the probate of testamentary papers. The Honorable George W. Wickersham (now the federal Attorney General) is the petitioner in one of the proceedings, and he seeks to have admitted a will dated October 7, 1896, and a codicil thereto, dated October 20, 1897. Concerning the validity of these testamentary papers there is no contention. Their factum has been adequately established.

Mr. Raymond is the petitioner in the second proceeding, and he seeks to have probated a testamentary paper executed by the deceased as her will on October 31, 1903, in which paper he is named as executor.

Caroline, or "Karolina," Koch is the petitioner in the last proceeding, and the paper which she seeks to have admitted is, upon its face, only a codicil to a previous will executed by the deceased, and there is named no executor therein. This codicil is dated February 27, 1904.

The testamentary capacity of the testatrix at the time of the execution of the first will of 1896 and the codicil thereto of 1897 is not disputed, and the claim of undue influence, in respect thereof, has likewise been withdrawn by all parties in interest. Therefore the only issues undisposed of arise in relation to the probate of the will of 1903 and the codicil of 1904.

Charlotte A. Van Den Heuvel, whose testamentary intentions are the subject of very serious dispute in this proceeding, died in this county in January, 1910, seised of the freehold property in which she had lived and died, and possessed of a very considerable amount of personalty, conceded to be approximately $85,000. At the time of her death, Miss Van Den Heuvel was in the eighty-sixth year of her age. She was the last of her immediate family, and the only survivor of a once numerous household which had dwelt in the old-fashioned house in which Miss Van Den Heuvel lived and died. Sprung of a conspicuous race, as the evidence discloses, a race which deserved well of the republic, and possessed of the best American traditions, which antedated the republic itself, the deceased lady was always very conscious of her claim to a distinction merited by the facts stated. Such facts figure much both in the direct evidence and in the briefs of counsel. The surrogate, however, need not refer to these accidents of birth further than to point out their relations to the testimony. Simple in her life, as became the good traditions noticed, Miss Van Den Heuvel bore the marks of the more rigorous seclusion and training characteristic of the women of her school in this country, and, singular to note, these marks she preserved when the vigor of her youth and intellect had vanished. As testified to by her kinsman's wife, Mrs. Stark, of New Hampshire (for it appears in evidence that the Robert Morris family to which Miss Van Den Heuvel's mother belonged had in some way intermarried with the family of the celebrated Revolutionary General Stark, of New Hampshire), Miss Van Den Heuvel had, in her best days, been always a submissive and helpless daughter and sister, very dependent upon others for all practical directions. Her claims on her friends and relatives seemed to turn on a certain unde-

fined and indefinable charm of manner and good breeding which never deserted her, and which stood the helpless lady in good stead in the days of her adversity and utter loneliness. When the last of her natural protectors, her brother John, died in 1894, her retiring lawyer and man of business, the late Mr. James F. Ruggles (much respected in this community), intrusted Miss Van Den Heuvel's affairs to Mr. Wickersham, of the law firm of Strong & Cadwalader of this city. Never was trust better bestowed or better fulfilled. With infinite patience, and generous solicitude, these gentlemen not only watched over Miss Van Den Heuvel's pecuniary affairs, but ultimately, when occasion required it, they charged themselves voluntarily with the task of seeing that their helpless client was cared for and protected in all the vicissitudes of her lonely old age. Their conduct in this respect does great honor not only to the profession of the law, but to the unselfish impulses which prompted such lofty and magnanimous conduct toward the incompetent. Miss Van Den Heuvel's nearest relatives (her cousins in some degree) seem to have recognized the wisdom of delegating the care of their relative to the professional gentlemen mentioned, and to all except a consultative degree they abdicated both their duty and their responsibilities, and they left Miss Van Den Heuvel entirely to the charge of these very loyal and responsible lawyers.

In about the seventy-second year of her age Miss Van Den Heuvel made the will and codicil which is now in dispute, and which must be taken to represent her deliberate and sufficient testamentary intentions. She had about this time offered to leave her estate to Mr. Wickersham himself, or, failing that, to charities. The gift to himself Mr. Wickersham, of course, promptly declined, and he suggested that her relatives should be regarded rather than charities in her testamentary disposition. The relatives she selected were some cousins more familiar to testatrix, but not including Mr. Stark. By the codicil of 1897, this cousin, Charles F. M. Stark, received a portrait of Mrs. Thomas Morris, but he received nothing more. The poorer, or best known, cousins, were generally preferred to the richer in the scheme of the first will. Up to this time Miss Van Den Heuvel had enjoyed nominal control of her affairs, and she had been the custodian of her own property, some of which she improvidently gave away, in several instances without Mr. Wickersham's consent or knowledge. In 1900 Miss Van Den Heuvel's waning mind collapsed altogether, and Mr. Wickersham then consulted Mr. William H. Bibby, her nearest male relative in blood and residence, and then Mr. Wickersham himself took over the custody of Miss Van Den Heuvel's securities. Her personal bank account was soon closed, and her means were henceforth faithfully expended in her care and support under the supervision of Mr. Wickersham, or the gentlemen connected with him in his office.

In February of 1900, Miss Van Den Heuvel's mind having collapsed, as stated, she was examined by several eminent alienists of character and standing. They recommended her commitment to custody, finding that she was suffering from senile dementia and delusions of persecution; a kind of delusion I believe most characteristic of paranoia and general insanity, and inconsistent with partial insan-

ity.   While papers were then actually prepared for proceedings to sequestrate her estate, or to commit her in some way to custody, Miss Van Den Heuvel never was, in fact, committed.   The proceedings were abandoned and by a family compact or arrangement an attendant, Miss Karolina Koch, the proponent and beneficiary of the last codicil propounded, was employed as a substitute, and in order to guard and care for the person of Miss Van Den Heuvel, Miss Koch, a German by birth, came from a hospital for mental derangements in this city, and was presumably thought a proper person for the trust in question, although little evidence seems to have been required of her past history or qualifications.   At least none was given to me.   However this was, she thenceforth, until discharged, lived at Miss Van Den Heuvel's house, where she assumed general charge and oversight while caring for Miss Van Den Heuvel under the supervision of Mr. Wickersham and his agents.   That Miss Van Den Heuvel thenceforth became most dependent on Miss Koch in every way is apparent.   That Mr. Wickersham after 1900 assumed the custody of the estate, and the direction of the receipts and expenditures of the household and estate of Miss Van Den Heuvel is also established.   This kindly arrangement obviated the disagreeable necessity of any more formal custodianship of the person and estate of Miss Van Den Heuvel.   The change in question was well meant, but it led directly, I think, to the complications apparent in this proceeding.   Whatever the guardianship thus exercised over Miss Van Den Heuvel was, in law, from the character of the employment it ought to have been sacredly binding on Miss Koch, and it is to be recognized in this cause.

As the evidence developed, there was to the surrogate a very significant bit of testimony given by Miss Koch herself, to the effect that shortly after her employment as custodian she *slapped* Miss Van Den Heuvel to cure her of scratching the witness, and she says that the remedy was effective.   Miss Van Den Heuvel's account of this *punishment* and cure we never can have, but we may take notice that persons familiar with the treatment of the incompetent have recognized the indelible impression an incident of this character ordinarily has upon the future relations of a custodian and her ward.   It is never effaced.   Just as a beaten animal never forgets a stroke, so a feeble-minded person assumes thereafter a timid position of submission, never eradicated.   The domination thus established is lasting and complete, though it may be unconscious.   In view of the punishment administered by Miss Koch, the surrogate was not surprised at Mr. Strong's subsequent testimony that the fear thus engendered was lasting.   It is only from such imperfect data as that stated that we may infer what character of domination really transpired thereafter in the household of that lonely old lady, then in her seventy-sixth year.   But I do not predicate any conclusion in this cause of any such matter, even though it may be an inference from facts duly established in the cause.

It was in the old house, so long occupied by Miss Van Den Heuvel, and presided over by Miss Koch, that the testamentary papers now questioned in this proceeding came to be executed, under the circumstances which I shall hereafter consider.   It is apparent that, as the old

residents of the quarter in which Miss Van Den Heuvel's house stood gradually removed to the newer residential districts of the city, Miss Van Den Heuvel was, in 1903, necessarily deprived more and more of the visits of her old acquaintances and relations who lived at a distance. She was left more and more exclusively to the ministrations and control of Miss Koch, who seems to have gradually substituted her own acquaintances for the more natural associations of Miss Van Den Heuvel. However excellent the new neighbors and acquaintances may have been in fact, they were not the associates of Miss Van Den Heuvel's family or youth. The new association, while diverting no doubt, could have had little in common with one who preserved outwardly, at least, the characteristics of a more refined and distinguished association. Occasionally the monotony of her existence was interrupted by an entertainment of some kind, at Christmas or on birthdays, got up to please Miss Van Den Heuvel. On such occasions the lessening circle of old friends and kinsmen would reappear in the old house to pay their respects to Miss Van Den Heuvel, or out of regard for her. It is apparent from the testimony that at such festivities Miss Van Den Heuvel, in her childish delight testified to by the witnesses, preserved vague recollections of the old ceremonious social intercourse. The acquaintances of her life sometimes would have to be formally introduced and presented to her, to their own amusement; but she always received them with something of her traditional good behavior. The new acquaintances of the reconstructed household were not, with the exception of Mrs. Ladow, present on such ceremonious occasions, although Mrs. Ladow herself believes that she was present once. But after the ceremony was over and the old house had lapsed once more into silence, and Miss Van Den Heuvel was left again to the exclusive care and ministrations of Miss Koch, the new acquaintances would reappear in the old house, and some of them figure actively in the proceedings before me. It is a curious picture in outline which I have presented, but still more curious in detail, and one necessary to prefigure the issues of fact and the conclusions of law in this singular case.

The contestants of the later testamentary papers deny that Miss Van Den Heuvel ever regained testamentary capacity, or that they stand for her will. The years between 1900 and October, 1903, when the first disputed testamentary paper appears, certainly indicate some betterment in Miss Van Den Heuvel's mental and physical condition. That she was the better physically for the astute care of her very competent attendant is apparent. But that she was sufficiently re-established in mind for an act of testamentation has not been established. Whether the later testamentary papers are, therefore, her free will and her conscious and deliberate act, is the question for the surrogate.

[1] That Miss Van Den Heuvel after 1900 was accustomed to have dividend checks to her order, and proxies or powers, brought to her, and that she indorsed or signed them, is apparent. But that she never after 1900 was called upon by Mr. Wickersham or his agents to execute any dispositive or grave acts is also apparent. The difference in the quality of legal mind required for a merely routine or perfunc-

tory act, and that required by law for a dispositive or testamentary act, is substantial, and it was constantly recognized by those who acted as Miss Van Den Heuvel's natural guardians and as her people of business, and in all instances after 1900, with the exception of the testamentary acts in question. The execution of such formal acts as proxies and indorsements of checks by Miss Van Den Heuvel, under the direction of her self-constituted or natural guardians, is insufficient to rebut the presumption, if once established, of her incapacity to testamentate. Groom v. Thomas, 2 Hagg. 433. This notable and familiar decision of Sir John Nicholl, well cited to me in this cause in behalf of the contestants of the later testamentary papers, is very apposite on this point. Sir John Nicholl, while not infallible, is conceded to have been one of the very ablest judges who ever sat in a court of probate, unsurpassed in his power of analysis and in the application of the great principles of testamentary law to difficult combinations of facts. In this country it is doubted if he has ever been surpassed unless by Mr. Bradford, once the surrogate of this county. In Groom v. Thomas, 2 Hagg. 433, Sir John Nicholl had before him a state of facts very similar to those now presented to the surrogate in this cause, and on one of the same contentions that is here presented he said:

"It has been relied upon that he (the testator) was treated as a person of sound mind; that he executed instruments—powers of attorney, deeds of assignment, drafts on bankers. But is his recovery correctly to be inferred from these circumstances? It is necessarily the case, where the person is in the hands of his family who are unwilling to take out a commission of lunacy, that, under their sanction, such formal acts should be done and such instruments signed; but it seems that the person and the concerns of the deceased were managed by his wife, his brother, and his nephew, and not by himself. Though they did not coerce his person (except, indeed, when excited into violent paroxysms of passion), yet they watched him closely; they humored and pleased him by bringing the servant (or rather the apothecary, the brother of the person who was recommended as his attendant), and allowing the deceased apparently to engage him; and they carried him to see the lodgings in Hyde street; but it was the family, and Mr. Young, the solicitor, who managed him and his concerns; they had a general power of attorney to dispose of his business and his property; and though the deceased executed the formal instrument, and the assignments and the drafts, it is quite manifest that the wife, the brothers, and the nephew, as I before mentioned, sanctioned by Mr. Young, very naturally and very properly conducted everything; they, considering it unnecessary to take out a commission of lunacy, as the deceased was very calm, acted for him; they placed him in lodgings in Hyde street; and they removed him when Mrs. Strutt and her other lodgers would no longer suffer him to remain."

[2] It was on October 31, 1903, that the first contested testamentary papers came into being. This will, known as the "Raymond will" from its draftsman and proposed executor, is seriously questioned in behalf of those who take under the first and established will of Miss Van Den Heuvel. They deny that Miss Van Den Heuvel had in 1903 testamentary capacity, or that the Raymond will was her free, deliberate, and conscious act. That the burden of proving the affirmative is always on the proponents throughout a testamentary cause is not to be doubted since the decision of the privy council in the case of Barry v. Butlin, 2 Moo. P. C. 480, constantly adopted or reaffirmed

in this state; Crispell v. Dubois, 4 Barb. 393, 397; Matter of Kellum, 52 N. Y. 517; Rollwagen v. Rollwagen, 63 N. Y. 504, 517; Howland v. Taylor, 53 N. Y. 627. The degree of proof resting on proponent simply varies with the circumstances of the particular case. Post v. Mason, 91 N. Y. 547, 43 Am. Rep. 689; Will of Cottrell, 95 N. Y. 336; Will of Campbell, 136 N. Y. Supp. 1086; Matter of Sandberg, 75 Misc. Rep. 38, 134 N. Y. Supp. 869; Jarman, Wills (6th Ed.) 30, 48; Ashwell v. Lomi, 2 Prob. & Din. 478. What is meant by the expression sometimes used ·in probate causes, that the burden shifts to contestants, setting up special pleas of undue influence, fraud, and the like (Matter of Martin, 98 N. Y. 196), is that the burden of going forward with the proofs of such allegation shifts to those setting it up as an affirmative plea by way of defense. But when the adminicular proofs come to be taken up by the proponents, the onus probandi, the whole case is resumed and rests on proponents throughout the trial. Matter of Cottrell, 95 N. Y. 336; Thayer's Cas. on Ev. 32, 82, 100, 106; Matter of Schreiber, 112 App. Div. 495, 98 N. Y. Supp. 1114; Matter of Goodwin, 95 App. Div. 183, 88 N. Y. Supp. 734; Doheny v. Lacy, 168 N. Y. 220, 61 N. E. 255; Rollwagen v. Rollwagen, 63 N. Y. 517.

The plea of undue influence or fraud is concomitant, or involved in the proponent's allegation of will. It is a mere statement of fact by way of denial. It is a mistake to affirm that such a plea, although affirmative in form, stands out as an independent affirmative allegation dehors the facts resting on proponents to prove. Such a plea is by way of avoidance of the proponents' fundamental allegation, that the propounded paper is the last will and testament of the deceased. The proceeding in probate being in rem, the whole contest turns on one allegation, viz., the paper propounded *is* the last will and testament of a deceased. This is the allegation always to be maintained by proponents of a testamentary paper. How then can the burden of proof be said ever to change in a testamentary cause, when there is but one issue in substance, and that issue is alleged affirmatively by every proponent in a probate cause? Mortimer on Probate Law & Prac. 60, and cases there cited; Kay v. Met. St. Ry. Co., 163 N. Y. 453, 57 N. E. 751. Our probate law and the civil law differ greatly in this particular. In the civil law there was a special independent proceeding, or plaint, on inofficious testaments: "Querela nullitatis ex jure novo;" "querela inofficiosi testamenti." The Roman system of probate corresponded more to our quondam probate in common form. After such probate the attacks on the will were independent and affirmative. But, as I have shown by authority, this is not the rule in our courts of probate, where the onus probandi throughout the cause rests on proponents.

[3] It has been shown that the burden of proving that the Raymond will of 1903 was the last will and testament of Charlotte A. Van Den Heuvel is on its proponents. How have they discharged this burden? We have briefly indicated the deplorable state of this testatrix's mind in the year 1900, and that she was practically sub tutela, or, in other words, was then in the charge of her friends, pursuant. to a sort

of a family compact or arrangement which in most other countries is legally recognized, and which in England and in this country is entitled to the respect accorded to it in the case already cited. It is practically conceded by all the parties to this controversy, or at least it is not controverted, that in 1900 Miss Van Den Heuvel was incapable of an act of testamentation. Under one of the greatest of legal presumptions, such a state of facts or condition, once established, is presumed to continue. Smith v. Tebbitt, 1 Prob. & Div. 434; Waring v. Waring, 6 Moo. P. C. 357. Without resort to this great presumption after a lapse of time, judicial administration would oftentimes be impossible. City of Cohoes v. Delaware & Hudson C. Co., 134 N. Y. 397, 407, 31 N. E. 887; Matter of Huss, 126 N. Y. 537, 541, 27 N. E. 784, 12 L. R. A. 620; Wilkins v. Earle, 44 N. Y. 172, 4 Am. Rep. 655; McMahon v. Harrison, 6 N. Y. 443; Wilson v. Hodges, 2 East, 312. Such a state or condition once established casts upon the proponent of the Raymond will of 1903 and the later Koch will additional burdens, in order to satisfy the requirements of probate law. The proponents of such a will must come prepared to prove with particularity that the will of the aged testatrix was the voluntary and conscious act of testatrix. Sutton v. Sadler, 3 C. B. (N. S.) 87; Cleare v. Cleare, L. R. (1 Prob. & Div.) 555; Fulton v. Andrew, L. R. (7 H. L.) 448; Tyrrell v. Painton (1894) P. 151; Cartwright v. Cartwright, 1 Phill. 90, 100; Groom v. Thomas, 2 Hagg. 433; Jackson v. Van Dusen, 5 Johns. 144, 4 Am. Dec. 330; Rollwagen v. Rollwagen, 63 N. Y. 517; Keely v. Moore, 196 U. S. 38, 25 Sup. Ct. 169, 49 L. Ed. 376. Even if Miss Van Den Heuvel was not in 1900 so wholly incapacitated as to afford ground for a commission of lunacy, and I am inclined to think from the evidence that she was so, yet. as Lord Hardwicke observed in Lord Dougal's Case, 2 Ves. Sr. 408, her mental weakness is to be taken into great account in respect of any attempt by her to make a will. Was her mental deterioration, conceded by every one, afterward so ameliorated as to constitute testamentary capacity? This is the main point in this cause, and one which is not answered to my satisfaction.

[4] The proponents of the Raymond will of 1903 have attempted to make out a restoration of Miss Van Den Heuvel's mental powers to a degree sufficient to testamentate, and it is incumbent on them so to do. But I quote from their able argument submitted to me in behalf of the proponents of this particular will:

"It is unquestionable that from 1900 or thereabouts down to about 1905 and 1906, Miss Van Den Heuvel was in a somewhat enfeebled condition of mind."

While I think this concession is not sufficiently strong in view of the evidence, yet this concession may be taken for the moment as a datum for the application of those principles of testamentary law which I deem relevant to the alleged testamentary act, sanctioned by Mr. Raymond. It is also conceded on the part of the proponents of this instrument that Mr. Raymond was a personal friend of Mr. Stark, that cousin of Miss Van Den Heuvel's whom she had omitted in her first and undisputed will, but who was named in the Raymond will.

Mr. Stark undoubtedly deemed the Raymond will a fairer testamentary scheme than the one which had omitted him. But the serious question for the surrogate is: Was Miss Van Den Heuvel in a condition to think so, and to act upon it, or was she at that time intestabilis, or, in other words, incompetent by probate law, taking into consideration all the circumstances surrounding the execution of the Raymond will? It is not enough for the proponents of the Raymond will to make prima facie proof of factum only. Under the circumstances developed in this consolidated cause, they must go further and establish that Miss Van Den Heuvel was possessed of a testamentary mind.

The condition of the household of testatrix on October 31, 1903, the date of the inception and fabrication of the first questioned paper, and the peculiarities attending its execution, are all to be taken into the final account in determining its title to probate. That Karolina Koch, the attendant of Miss Van Den Heuvel, had in some way an indirect hand in the inception of this paper, I do not doubt, from the circumstances given in evidence, sometimes reluctantly and sometimes only indirectly. But, when we come to group these apparently unrelated circumstances established by the proofs, they point unmistakably to an author of the paper outside of Miss Van Den Heuvel. That Mr. Stark entered into any scheme of deliberate fraud, I do not for a moment think. He was, as I am informed, at the bar, a gentleman of ample fortune and of very good position. That he did not see any reason for his omission in the first will of testatrix, I, however, infer from his subsequent conduct; and that he lent himself, very unwisely, to some ulterior design of Miss Koch, I see more clearly than did he. When Miss Van Den Heuvel came to sign the paper in controversy, she was, as I have stated, under the care of Miss Koch. Miss Koch was the last person who at any time should have had any agency, passive or active, in any scheme of testamentation for Miss Van Den Heuvel. But that she had decided ideas on the subject of Miss Van Den Heuvel's property and its disposition, and her own superior claims to it, is apparent to me. She thought such claims of her own very much more just than were the claims of those cousins of testatrix designated as heirs in the undisputed will of 1896 and 1897.

About 1903 Miss Koch's claims for a settlement or permanent provision for herself, out of Miss Van Den Heuvel's estate, matured and were made evident; sometimes with a menace, always with a finesse and keen appreciation of the delicate nature of the control exercised by Mr. Wickersham. That Miss Koch was astute and unprincipled in this respect, I think the evidence demonstrates, and that she embarrassed the relatives of Miss Van Den Heuvel and Mr. Wickersham by her conduct and dealings is also apparent. Her continued presence was, however, thought expedient for the care of her helpless charge. That Miss Koch knew that she was acting an unprincipled and unscrupulous part in the betrayal of her employers, I do doubt. In courts of probate it has been necessary for hundreds of years to search very minutely into the motives and conduct of the actors in the different testamentary acts before the courts. The reports of such causes are infinite and the opinions instructive, and nowhere else are exhib-

ited more curious or interesting psychological problems.   In serious French literature there is a marvelous psychological investigation of this sort, where the principal character is unaware of a complex baseness which characterizes every act of an apparently innocent and ingenuous life.  As this cause developed, I was constantly reminded of that curious study in the operations of the human mind, for I had some doubt whether the impropriety of the conduct apparent in this cause was ever conscious to the main actors in it.   In law the missing motive or intent has often to be inferred from the acts proven.   In a court of probate it is highly essential and sanctioned by authority that the motives and conduct of all concerned in an act of testamentation should be subjected to scrutiny, not arbitrarily or on fanciful theories, but on principles long laid down in probate law.   Wherever intent is at issue, and in probate courts it is always at issue, such a critical examination is essential to the correct disposition of a cause.

The evidence taken before me revealed that Miss Koch, during the course of her surveillance of the lonely old lady in the out of the way house where they lived, was, unknown to Mr. Wickersham, carrying on a "furnished room house" in another part of the town, ostensibly in partnership with one Miss Georgiana Pomeroy.   Strange things happened in this boarding establishment, for it was on one occasion raided by the police as a gambling establishment, although there is no evidence that Miss Koch sanctioned such a pursuit on the premises.   But in any event, it was to such an establishment that the innocent and unfortunate lady, whose testamentary intentions are here questioned, was occasionally taken by her guardian, Miss Koch, without Mr. Wickersham's knowledge.   It was this same Miss Pomeroy, soon to be the partner of Miss Koch in such establishment, who on October 22, 1903, summoned Mr. Stark, the cousin of testatrix, from New Hampshire, by what I cannot but think was a very adroit, but at the same time damaging, letter.   The writer of the letter apologizes for her epistolary intrusion, and recounts Miss Van Den Heuvel's affection for Mr. Stark.   She states that the writer "has no ax (sic) to grind," but implores him "by his old-time affection" for Miss Van Den Heuvel to come to her as soon as possible "to interfere in her business affairs. She told me yesterday you" (Mr. Stark) "were the only one who had any right to meddle," she adds.   The writer significantly states that Miss Van Den Heuvel "realizes much that she is not given credit for." It was at this time that trouble with Miss Koch was acute.   It was Miss Koch's business that was then pressing.   In response to this skillful summons, Mr. Stark immediately appeared on the scene in New York.   That the business complications with Miss Koch and this summons to Mr. Stark to interfere led in some way to the testamentary papers drawn by his legal acquaintance, Mr. Raymond, is obvious from the record.   Miss Koch thereby attained her provision, and Mr. Stark a will to his satisfaction.

Mr. Raymond, the draftsman of the will of 1903, was called to the stand by proponents.  He testified that he was summoned to her house by a letter from Miss Van Den Heuvel as follows:

"October 29th, 1903, Dear Mr. Raymond, please come and see me tomorrow. C. Van Den Heuvel."

Pursuant to this summons, the will of 1903, naming Mr. Raymond as executor, and destructive of the will of 1896 and 1897, was made. Considering Miss Van Den Heuvel's condition of dependence in 1903, her very distant acquaintance with Mr. Raymond, her business dis-associations, and Mr. Raymond's advent so soon after Mr. Stark's ar-rival in response to Miss Pomeroy's urgent request, I cannot think that sufficient evidence has been given that Mr. Raymond's employment to draw her will was the unprompted or voluntary act of Miss Van Den Heuvel alone. Mr. Raymond knew generally of Mr. Wicker-sham's relations to Miss Van Den Heuvel; but he failed to advise Mr. Wickersham of the new professional relations, or of the new will of 1903. He kept it profoundly secret. The will of 1903 was in fact clandestine in so far as Mr. Wickersham was concerned. The instant a transaction (even of a confidential kind) becomes clandestine, it is stamped in law and is to be scrutinized by a court of probate. I re-member for many years back a leading case on this point, decided by Sir H. Jenner Fust, a great authority on probate law. It is now re-ported in a late official edition, Ashwell v. Lomi (1869) 2 Prob. & Div. 477, and see Brydges v. King, 3 Ecc. Rep. 135.

In Ashwell v. Lomi, in the Prerogative Court of Canterbury, the court placed great reliance on the clandestine character of an act of testamentation, and the obvious desire of all concerned to conceal such act from observation. When I heard Mr. Raymond's evidence deny-ing any agency of Mr. Stark in the will, I was put in mind of the prin-ciple underlying Ashwell v. Lomi, although the facts differed. I felt that Mr. Raymond knew something which he ought to disclose, and yet a something which a rigorous cross-examination failed to elicit from the reluctant Mr. Raymond. He had preserved no professional records, no correspondence of that date, of October, 1903. He kept no professional records of this will, no data, no letters; all had dis-appeared except his summons to come to testatrix. I cannot but think that the great legal maxim, "Omnia præsumuntur contra spoliatorem," applies to Mr. Raymond's case in some degree, and he cannot complain if we infer that his correspondence, if kept, would at least have dis-closed some communication to or on the part of Mr. Stark, in refer-ence to the will of 1903, for Mr. Raymond was the old acquaintance of Mr. Stark. Mr. Raymond appeared on the scene about the same time with Mr. Stark. His will provided for Mr. Stark and for Miss Koch to the extent of her existing demands. There is, in any event, a striking concurrence of dates, results, and circumstances about the will of 1903, which speaks plainly for some sort of co-operation in the plan, no doubt, inaugurated by Miss Pomeroy's letter, and she was the partner or friend of Miss Koch. Of this, at least, the surrogate is forced to take notice.

Counsel for proponents of the will of 1903, with his usual frank-ness and keen sense of professional propriety, has relieved me from the necessity of concluding from the testimony of Mr. Raymond that the Raymond will of 1903 was not connected with Mr. Stark's visit to his cousin, and this admission by counsel I am prepared and au-

· thorized to take in the face of Mr. Raymond's own testimony on the stand.   Counsel states:

"It is likewise undisputed that the will of October, 1903, was made as the result, or certainly as a consequence, of a visit paid to her by her cousin, Charles F. M. Stark, a few days prior to the execution of the will; that Mr. Raymond, the lawyer who prepared the will, was a personal friend and acquaintance of Mr. Stark."

The admission is, however, qualified by a statement to the effect that Mr. Raymond's own acquaintance with Miss Van Den Heuvel existed for a number of years before, and that the will of 1903 was Miss Van Den Heuvel's own testamentary act.   Of course, such a qualification was essential  to the continuance of the cause.   If Mr. Stark, Mr. Raymond, and Miss Koch did not co-operate together about the will of 1903, it is very remarkable, for they were all in the same house, about the same time, and all greatly interested in the affairs of Miss Van Den Heuvel.   The accounts given in evidence of the creation of the will of 1903 are, it seems to me, more consistent with art than with nature.   But inferences which are not irresistible cannot and ought not to be the basis of judicial conclusions.   I must assume that Miss Koch was ignorant of the letter which her friend Miss Pomeroy had written to Mr. Stark.   That Miss Koch did complain of her hard circumstances to Mr. Stark on his visit is apparent, and that she subsequently appeared in the will of 1903 for a lump sum equal to her demands is also apparent.   The will of 1903 being accomplished and Miss Koch placated, Mr. Stark and Mr. Raymond, with the will, went their separate ways, leaving the alleged incompetent, Miss Van Den Heuvel, as before in the charge of the obviously competent Miss Koch.   Without Miss Koch's concurrence and permission, it is apparent to me that the will of 1903 could not have been made.   She alone had then the practical control of admission into the house in which testatrix lived and where the will of 1903 was executed.   Miss Koch was placed there by Mr. Wickersham for the very purpose of excluding improper people from Miss Van Den Heuvel, and implied in her employment was, I think, an obligation to keep her real employers informed of anything adverse to the best interests of Miss Van Den Heuvel.   See Patterson v. Meyerhofer, 204 N. Y. 100, 97 N. E. 472.   That Mr. Raymond, and certainly not Mr. Stark, were improper visitors I do not for an instant assert; but that their business was clandestine the evidence plainly discloses.

As I am not permitted to assume that the will of 1903 was in fact a joint production of Mr. Raymond, Mr. Stark, and Miss Koch, I must next scrutinize it in the view put forward that it is the testamentary act of Miss Van Den Heuvel alone.   In October, 1903, as before, Miss Van Den Heuvel was in fact deprived of any real care in the management of her own estate; she was confided to the care of Miss Koch, who was employed to look after her well-being in every way. That Miss Koch did this duty to the satisfaction of Miss Van Den Heuvel's self-constituted guardian and friend, Mr. Wickersham, is not precisely denied.   That Miss Van Den Heuvel was then in a condition to require some such supervision, the evidence conclusively

shows, or, rather, it does not show with the distinctness it should show that the condition of Miss Van Den Heuvel's mind, which led to Miss Koch's employment, had materially changed; and the burden to so prove rests on the proponents of this will, by well-established authority before cited. I do not think it incumbent on me to recount all the details of the evidence which point to a lack of testamentary mind in Miss Van Den Heuvel in 1903. That there is some discrepancy between the witnesses on the permitted point of Miss Van Den Heuvel's rational conversation and conduct in 1903 is evident. The friends who may be classed as Miss Koch's friends differ materially on this point from the old friends of the family of Miss Van Den Heuvel. That the difference between them is not honest conviction I do not for a moment imply; but that the old friends of Miss Van Den Heuvel were in a position to be the more competent observers was obvious to me on the trial as I heard the evidence develop. I am of the opinion that the weight of evidence establishes, apart from other material circumstances to which I shall allude, that on the 31st day of October, 1903, Miss Van Den Heuvel was not possessed of that sound and disposing mind which the law requires for an act of testamentation. But, if by any chance she possessed that limited degree of intelligence required by testamentary law for such an act, proponents have not established that the will of 1903 was her free, deliberate, and conscious act under the peculiar circumstances of this cause.

There is nothing in the evidence which establishes that Miss Van Den Heuvel in October, 1903, had been restored to mental health. Not only was Miss Van Den Heuvel then in the voluntary charge of her friends, but her affairs were out of her hands and control, and she herself was then under the care of Miss Koch. Miss Van Den Heuvel still passed much of her time in caring for her best possession, a favorite macaw or parrot, which figured greatly in the evidence before me and in the cause generally. That Miss Van Den Heuvel's conduct in this respect transgresses the limit of normal conduct may be the fact as asserted, but I am not willing to predicate a legal conclusion of such a common eccentricity alone. Those familiar with the habits of very old people of Miss Van Den Heuvel's station in life will bear witness to a singular fact, that such persons, reared generally in relative seclusion and with great social reserve, are much more apt at some stage of their existence to transfer their interests to the dumb creatures, than are those habituated to a freer training in the school of life. The wider interests of those habituated to a less restrained social intercourse provide them more easily with more public and congenial diversions. That Miss Van Den Heuvel's parrot was so remarkable in fact as in some degree to justify her preference is apparent, as counsel observed on the trial, for it would take up the refrain of the old songs its mistress continued always to sing for her visitors to the tunes and words which she had learned in her far-off youth. But whether it was or was not remarkable, I am unwilling to base any conclusion, for the reason stated, on so trifling an incident in the existence of Miss Van Den Heuvel. In connection

with other matters shown in evidence, Miss Van Den Heuvel's exaggerated affection for her parrot is not, however, destitute of legal significance.

The capacity of Miss Van Den Heuvel to make her will in 1903 and 1904 is from the evidence more than doubtful. The opinion of the two very competent medical gentlemen, Dr. Dana and Dr. Brannan, called on the part of contestants, is very clearly to the effect that the mental malady which afflicted Miss Van Den Heuvel in 1900 was grave, progressive, and incurable. In so far as their testimony relates to a prognosis which was subsequently susceptible of exact observation, the opinion of permanency is of no value unless consistent with the evidence. The nature of Miss Van Den Heuvel's malady, according to the evidence, was senile dementia. I can detect no sufficient proof that Miss Van Den Heuvel was ever cured of it after 1900, although there is some evidence that she became somewhat clearer mentally in 1903 and 1904 than in 1900. But the evidence of Dr. Reis and Dr. Born only confirms Dr. Dana's and Dr. Brannan's diagnosis or prognosis that her malady was progressive. The testimony of proponents' experts who never saw Miss Van Den Heuvel was so provisional as to give me no assistance.

I shall briefly refer to the 31st day of October, 1903, when the Raymond will was executed. What in fact then took place, and who were the associates of this particular act of testamentation? The attesting witnesses to the will of this date were friends of Mr. Raymond. They never had seen Miss Van Den Heuvel before the moment set for the ceremony of execution. Their stay in the place of execution was brief, and their opportunities to form an opinion of Miss Van Den Heuvel's state of mind were most limited. Their most vivid recollections of the occasion concerned the parrot. Their opinions as to the competency of Miss Van Den Heuvel to execute a will could have no better foundation than their limited opportunities afforded. While it is not indispensable in the formal proof of a will that its attesting witnesses should have any prior acquaintance with a testatrix (Marx v. McGlynn, 88 N. Y. 357), yet, in a case where mental competency is at issue, the opinion of attesting witnesses who do not know testatrix is, on a point of mental competency, of the least possible value. Seaman's Friend Soc. v. Hopper, 33 N. Y. 631. It would be contrary to all reason to attach much conclusiveness to opinions of Miss Van Den Heuvel's competency when founded on such inadequate observations as those of these particular witnesses. Miss Van Den Heuvel's inherited and mechanical good breeding would in itself· be apt to mislead them. I myself asked Miss Koch when òn the stand very particularly whether in her worst moments Miss Van Den Heuvel's formal and ladylike deportment ever deserted her, and she admitted that it did not. Thus to a stranger any mental aberration in Miss Van Den Heuvel's case would not be readily detected. I cannot think that the evidence of these attesting witnesses to the will of 1903 is entitled to great weight on the question of Miss Van Den Heuvel's capacity to testamentate.

That the will of 1903 was ever read to Miss Van Den Heuvel, or

its contents known to her, is only to be inferred from indirect evidence or by established presumption. But I am not satisfied that Miss Van Den Heuvel was herself the author of this will of 1903. It bears marks to the contrary. The presumption of knowledge of its contents on her part is counterbalanced by the proofs of her mental condition, her position of tutelage at the time, and the clandestine character of the paper. Mr. Raymond, a very distant acquaintance of Miss Van Den Heuvel's, but a close acquaintance of Mr. Stark, was the actual draftsman of the will. He attended her professionally, he says, in the first place in response to a very unusual written request of Miss Van Den Heuvel's own. That it was unusual is apparent, for Miss Koch testifies that, in all her long experience at Miss Van Den Heuvel's house, she never knew testatrix to write another business letter. If this letter to Mr. Raymond was unprompted, it is unique in the history of Miss Van Den Heuvel. I have already pointed out that neither Mr. Raymond nor his witnesses could have gained admission to Miss Van Den Heuvel's presence in that secluded and solitary house without Miss Koch's consent, and yet these strange men passed in and out of that house on the occasion of this will, contrary to custom, and no report of such unusual doings was ever made to any one not concerned in the transaction. As to the self-constituted and efficient guardians of Miss Van Den Heuvel's person, peace, and estate, the will of 1903 bears the stamp of being a clandestine instrument. Brydges v. King, 1 Hagg. 256; 3 Ecc. Rep. 135. A clandestine instrument in law is very different from a confidential instrument. They are not to be confused.

Again, Miss Van Den Heuvel's signature to the will of 1903 exhibits great trepidation, which escaped all attention. What were the attesting witnesses doing that they failed to notice this particular aberration? Miss Van Den Heuvel's name was Charlotte A. Van Den Heuvel, and so she ordinarily wrote it. But when she came to sign this propounded paper of 1903, she writes these words, "Charlotte, Charlotte A. Van Den Heuvel, A. Van Den Heuvel, Heuvel." What a complication of nonsense! This is not a subscription in fact, and yet the very attesting witnesses of the document and execution did not notice it. Even Mr. Raymond did not observe it. No one apparently noticed it. What were the actors in that solemn ceremony doing or thinking about that such an extraordinary antic on the part of the main actor could have escaped all detection? The deviation from accuracy is as unnatural as if Miss Van Den Heuvel had written "Sun, Moon, Van Den, Jupiter Heuvel." What would be our conclusion in that case? The same, I think, as in this case. As Sir John Nicholl said in one of those splendidly considered testamentary causes of a century long gone: "The signature itself (to the will) is suspicious." Brydges v. King, 1 Hagg. 256. In this cause the signature is indeed very suspicious, when combined with the feeble understanding of testatrix. Such a deviation from the normal is not an inconsequential trifle. It is pregnant with suggestion in a circumstantial case. If testatrix could not subscribe her own name on such an occasion, what room is there for suspicion about the factum of the will, rogatio tes-

tium and animus testandi—all very essential to be made out separately on the part of a capable testatrix, and a fortiori essential in this disputable case. The proponents must, as I have stated, satisfy the conscience of the court in every particular, in such a case as this, that the will was the voluntary and the conscious act of a capable testatrix. How do they fulfill this duty in this cause? Certainly barely and only by strained inferences, if at all. But do they barely? I fear not even barely. I have heard the cause at great length, and I have read the depositions many times with extreme care, and I am unable to persuade myself that the burden resting on proponents has in this cause been adequately discharged. I am not satisfied that the testamentary paper of 1903, now propounded as a will, was the voluntary and the conscious act of a capable testatrix. The most admirable matters to be said in favor of the paper of 1903 were stated in the kindly and forcible argument of counsel for its proponents; but he could not reconstitute the facts, or himself supply the omissions apparent in the testimony bearing on the propounded paper of 1903.

It is, as stated above, an established principle of probate law that, whenever a single ground for suspicion exists, the burden of proving that the will was the voluntary and the conscious act of the testator lies on the proponent. Sutton v. Sadler, 3 C. B. (N. S.) 87; Cleare v. Cleare, L. R. (1 Prob. & Div.) 655; Fulton v. Andrew, L. R. (7 H. L.) 448; Tyrrell v. Painton (1894) P. 151; Rollwagen v. Rollwagen, 63 N. Y. 517; Code Civ. Pro., § 2622; Matter of Sarasohn, 47 Misc. Rep. 538, 95 N. Y. Supp. 975. So when mental incompetency is once established, the burden rests strongly on him who alleges an intermission. Cartwright v. Cartwright, 1 Phill. 90, 100; Groom v. Thomas, 2 Hagg. 433; Clark v. Fisher, 1 Paige, 171, 175, 19 Am. Dec. 402. Neither of these burdens resting on Mr. Raymond has been adequately discharged in this cause, and I am therefore constrained to pronounce against the paper propounded by Mr. Raymond.

I come next to the consideration of the paper of February 27, 1904, known from its sole beneficiary as the "Koch Codicil." No executor was nominated in this codicil. It was evidently not intended that Mr. Raymond, the executor named in the 1903 paper, should be disturbed by the new scheme of testamentary succession, if any thought was given to the subject. But as the codicil purports to be only a devise of the old and valuable family house of Miss Van Den Heuvel to Miss Koch, no executor was in fact necessary. There is no proof that Mr. Stark knew of the codicil of 1904. Indeed, his written objections in this cause indicate that he did not know of it. In such objections on his oath Mr. Stark states that the devise was procured "by fraud and *undue influence practiced* on, Miss Van Den Heuvel by Karolina Koch or some other person or persons acting in concert or privity with her." This sworn statement is on record in the cause. But on the trial Mr. Stark did not insist on the sworn objections in question, and, indeed, through the trial he did not hesitate to make common cause with Miss Koch for the probate of both the testamentary papers of 1903 and 1904.

'At the time the codicil of 1904 purports to be made, Miss Koch was still in control of the house and the person of Miss Van Den Heuvel under the arrangement made with her by Mr. Wickersham. That arrangement, in its integrity and the practical construction placed on it for years, required Miss Koch, while styled attendant, to be a faithful keeper and custodian of the person of Miss Van Den Heuvel; and in pursuance of this arrangement she had been in the habit of conferring with Mr. Wickersham or his agents on all important matters affecting Miss Van Den Heuvel. Yet the codicil of 1904 in her favor was not communicated to Mr. Wickersham in any way. Its inception in law bears all the marks of clandestinity, characteristic of its predecessor of 1903, and already noticed. The mere fact that Miss Van Den Heuvel had not been formally adjudged incompetent at any time cannot in this court be made a justification by the agent of her de facto guardian of the pretense that Miss Van Den Heuvel was sui juris, and free to do what she willed with her own, if, from the evidence, it is established that she was not so competent, or that her act of testamentation was stamped with the marks of clandestinity or irregularity.

There is no sufficient proof that on February 27, 1904, there was any material betterment in Miss Van Den Heuvel's mental condition. The mere fact that she could play dominoes or some simple game of chance, with the kindly friends of Miss Koch's selection with fair skill, does not establish Miss Van Den Heuvel's testamentary capacity; nor does the fact that she used her needle adroitly. The survival of such simple faculties is not inconsistent with a total loss of mental power in some instances.

There can be no doubt, under the authorities bearing on the devise to Miss Koch, that Miss Koch's position in 1904 created an actual, if not a technical, fiduciary relation toward testatrix, which, in view of testatrix's feeble or absent mind and her dependent condition, makes it highly incumbent on Miss Koch, as proponent of the codicil in her favor, to establish to the satisfaction of the surrogate the fairness and sufficiency of the transaction in every particular. Sutton v. Sadler; Ashwell v. Lomi; Cleare v. Cleare, supra; Parfitt v. Lawless (1872) 2 Prob. & Div. 468; Matter of Smith, 95 N. Y. 516, 523; Matter of Campbell, 136 N. Y. Supp. 106, and cases before cited.

The codicil of 1904, in favor of Miss Koch, is very singular on its face, and suspicious, in that it makes to this custodian of Miss Van Den Heuvel a combined bequest of Miss Van Den Heuvel's pet parrot in connection with the gift to her of the house and contents. Whether the house was intended to be appurtenant to this particular bequest of the parrot, or the parrot was intended to be appurtenant to the house, is a matter probably not remote from the true testamentary scheme, if any, in the mind of Miss Van Den Heuvel. If we have regard to the testimony, showing the exaggerated or foolish fondness of Miss Van Den Heuvel for the parrot in question, we may easily perceive that of the two gifts—the house and the parrot—the parrot in the mind of the concededly feeble-minded and gentle old lady would not be the least valuable. Was the gift in its entirety

really thought by Miss Van Den Heuvel to be a sort of charitable use, in which the parrot was to be the real beneficiary? There are some precise evidences of such a conclusion, absurd as it seems. But I will not place my conclusion in this cause on strained inferences. The lawyer's own evidence bears great confirmation of the inferences in question. He states on his oath, in substance, that testatrix asked him if the codicil surely gave the home and parrot to Miss Koch, and he replied that it did, and that then Miss Van Den Heuvel said, "All right," and then it seems she thanked him with her habitual courtesy. Surely this curious juxtaposition of house and parrot on so solemn an occasion is significant. The lawyer employed to draft the codicil of 1904 swears that in his professional interview with Miss Van Den Heuvel—ostensibly held to instruct him—she stated that the parrot called her "Mamma," and that it kissed her of a morning, and that it was her only pet, and much more of this sort of puerile nonsense. It appears from this lawyer's testimony that the testatrix was extremely diffuse in her remarks about the parrot at such interview, at which incidently she and the parrot sang for the benefit of this stranger. There was thus, according to the lawyer's own testimony, every plain indication afforded to him that he should have been most on his guard in his professional actions, yet there is a very singular omission in this gentleman's evidence, and that relates to no less a subject than the ancestral house which Miss Van Den Heuvel was very lightly about to give away from the connections of her own blood. On the subject of the testatrix's mention of the parrot, the lawyer's testimony is diffuse; but on the subject of her instructions about the old house, his evidence is noticeably reticent. His evidence is singularly confirmed by the evidence of his friend, Mrs. Ladow, for he told that lady that Miss Van Den Heuvel had left the "house and polly" to Miss Koch. Why is there so apparent in this cause this singular inversion of subjects of importance? Is it that this lawyer himself lacked a good sense of proportion, or is it that, without art, he narrates truthfully the substance of his professional instructions? I prefer and choose to believe that it is the latter. I believe also that Mr. Stark was right in his first contention about this codicil, and that Miss Koch was its real author. But I reach this conclusion independently of any pleading on the part of Mr. Stark, for that should not be held to prejudice Miss Koch.

It is another very singular fact in this cause that, while this paper of 1904 purports to be a codicil, its nominal or technical draftsman, the lawyer of 1904, intended it as a codicil to the undisputed will, which he heard that Mr. Wickersham had drawn. He states that he had no instructions whatever about the execution of the will of 1903 which Mr. Raymond then had in his office. Thus the lawyer of 1904 is at cross purposes with the lawyer of 1903, and Mr. Stark, in adopting the codicil of 1904, is in fact adopting an illegitimate codicil which has no relation to the testamentary paper drafted and propounded by his acquaintance, Mr. Raymond. Such a paradox in a testamentary cause would be amusing, if there were not at the same time so serious and to me so melancholy an exhibition of cupidity, or

careless error and lack of propriety. But let us proceed to consider what more the proofs show concerning the codicil of 1904, its inception, and its progress to this court.

The codicil of 1904 was drawn by a lawyer who made himself an attesting witness, and in consequence we have the advantage of his own evidence, some of which I have already quoted in substance. This lawyer was an utter stranger to Miss Van Den Heuvel prior to February 25, 1904, and this codicil was made at Miss Van Den Heuvel's house on February 27, 1904, two days after this lawyer first met Miss Van Den Heuvel. Such acquaintance was due primarily, it is said, to one Mrs. Ladow, a lady residing in the old quarter in which Miss Van Den Heuvel continued to live; but she was not a friend of Miss Van Den Heuvel's own family. Mrs. Ladow's original acquaintance with testatrix dated years back when she met testatrix at market or in the shops of the old quarter where they both then lived. With testatrix she frequently met Miss Koch. The lawyer of the codicil was the lawyer for Mrs. Ladow's husband, a hat manufacturer in Mercer street. Mrs. Ladow and Miss Koch attended the same church, but obviously from her testimony to that effect Mrs. Ladow regarded herself as Miss Koch's social superior and on the footing of a friend of Miss Van Den Heuvel, although she was apparently very familiar and friendly in her intercourse with Miss Koch. In any event, Mrs. Ladow states that it was she who procured the lawyer for the codicil of 1904, at Miss Van Den Heuvel's own request. I cannot see that this is incorrect, provided that Miss Van Den Heuvel was competent to so request. I must therefore regard this lawyer's employment as evincing nothing irregular, in so far as he was concerned in its inception. But that Miss Koch was privy to such employment I have no doubt. She could, had she chosen, have prevented the execution of this codicil. Instead, she suffered it to proceed, if not more, and under the circumstances of this case she is not therefore alien to it: "Qui tacit consentire videtur." She was certainly present on February 25th at the interview between the testatrix and the lawyer, and she had some part in the act; rogatio testium, or the summoning of the formal witnesses to the codicil. The lawyer of the codicil of 1904 kept particular notes of his interviews with Miss Van Den Heuvel, even to the extent of noticing a choice gift by Miss Van Den Heuvel of feathers from the parrot's tail. Indeed, had the parrot and not Miss Van Den Heuvel been about to make a will, this lawyer's notes on the parrot could not have been more appropriate to the occasion. On one of his visits to Miss Van Den Heuvel the lawyer also noticed the presence of Mr. Schwartz, who was an itinerant jeweler or peddler and a particular acquaintance of Miss Koch. Mr. Schwartz was afterwards present as an attesting witness to the codicil executed by Miss Van Den Heuvel in 1904. That he was the associate and friend of Miss Koch is established.

But it is only when we come to a critical examination of the execution of this codicil on February 27, 1904, that we detect its peculiarities, some of which I have already noticed. The lawyer who drew it is not sure that he did not have to be re-introduced by Miss

Koch to Miss Van Den Heuvel when he appeared with the codicil for execution. He is not sure whether or not Miss Koch paid him in great part for his professional services, and the evidence certainly points to her payment of the larger part of his bill for the codicil. To this codicil there were three attesting witnesses, a neighboring druggist, Mr. Kiehl, who in effect admits that he had grave doubts about Miss Van Den Heuvel's competency to make the will; Mr. Schwartz, the jeweler (who did not know what "rational" meant when asked concerning Miss Van Den Heuvel's competency); and the lawyer who had drafted the codicil. The opinion of the lawyer was that Miss Van Den Heuvel was competent, but his contemporary notes disclose plainly a case to the contrary. The opinion of the lawyer is not enough to establish the codicil in any event. The other two attesting witnesses to it were simple people, but, for aught I know, most kindly and excellent. I would form no conclusion on the basis of any honest man's occupation alone. From extended experience I have come to have a profound respect for the superior excellence of simple people. I am no respecter of great people only. The contestants, even if they complain of the condition in life of the witnesses, cannot but approve of their truthfulness. But whatever they were, such witnesses were not the best persons to testify to the competency of Miss Van Den Heuvel or to witness her will. Their acquaintance with testatrix was too recent or too inadequate for so complex and so delicate a situation as that of Miss Van Den Heuvel. When the codicil was signed, the lawyer took it away, stranger though he was, and it is now produced by Miss Koch. The custody of such a paper is important in a testamentary cause. In such a situation as existed, any act of testamentation by Miss Van Den Heuvel called for the greatest circumspection upon the part of all concerned in it. The codicil was not made at a time when Miss Van Den Heuvel's death was obviously near, nor was it made under the exigency of any such circumstance. It was a deliberate and meditated proceeding on the part of some one who was, I am convinced, not the testatrix alone. It is not established to my satisfaction that at this time Mss Van Den Heuvel was possessed of testamentary capacity to make the codicil of 1904.

It is unnecessary to allude in detail to all the evidence which imperatively dictates the conclusions that I have reached in this cause only after reflection and the most careful consideration. The trial was long and most thorough on the part of all the counsel concerned in it. I am satisfied that nothing on their part was overlooked which could give me any further assistance. But I am not satisfied that the codicil of 1904 was the free, the deliberate, and the conscious act of a capable testatrix. On the contrary, I am satisfied that it was not. Under the circumstances, I am not free to pronounce for the paper of 1904.

The findings and decree herein will provide that the undisputed will of 1896 and the undisputed codicil of 1897 are the last will and testament of Charlotte A. Van Den Heuvel and entitled to probate as such, and that the other scripts here propounded are not entitled to probate.

Decreed accordingly.