Matter of the Probate of a Paper Propounded as the Last Will and Testament of HENRY JACOBS, Deceased.

(Surrogate's Court, New York County, April, 1912.)

Wills — the testamentary instrument or act — forgery of will or fraudulent attestation of contents — probate, establishment and annulment — evidence — burden of proof.

Where the genuineness of an instrument purporting to be a last will is disputed, the burden of proving to the satisfaction of the surrogate its genuineness and due execution rests on the proponent. In such a case the surrogate may inquire particularly into the circumstances surrounding the possession and custody of the testamentary paper propounded.

Where a widow, who for over a year has been acting as administratrix of her husband's estate, offers for probate a will, which

Misc.]  Surrogate's Court, New York County, April, 1912.

gives all his estate to her, and upon a contest as to its genuine-
ness all the circumstances relative to the custody thereof from its
inception to its production are inconsistent with the testamentary
character and make against rather than for its validity, and the
testimony on every issuable fact is controverted, proponent has
not sustained the burden of proof resting on her, and probate will
be denied.

Where the alleged signature of testator to the will was alter-
nately sworn to be a forgery and genuine with equal freedom, the
proponent is entitled to the benefit of the presumption of inno-
cence, though the rule is not strictly applicable.

PROCEEDING upon the probate of a will.

Samuel J. Siegel, for proponent.

Hamilton, Gregory & Freeman, for contestant.

FOWLER, S.    This in one respect is a most unusual case
in this tribunal.  As stated in the written brief of counsel,
submitted in behalf of proponent: " the testimony    *    *    *
is most conflicting, almost every fact testified to by any of
the witnesses being contradicted."    This frank and justified
statement by proponent's own counsel is very significant on
a contested probate, where the burden of proof, by estab-
lished authority, rests so strongly on the proponent through-
out the trial.

For more than a year past the proponent has been acting
as the administratrix of her late husband, Henry Jacobs.
The sworn petition for the widow's appointment disclosed
that Henry Jacobs died intestate or without a will.  It was
only after a long course of administration by the widow, and
after trouble and altercation had developed between those
entitled, pursuant to the Statute of Distributions, to succeed
to the estate of Henry Jacobs, that the paper propounded was
discovered, under circumstances which, to say the least, are
unusual.  These circumstances in themselves tend to excite
some suspicion, in view of the proofs, concerning the gen-
uineness or sufficiency of the testamentary paper propounded.
The mere appearance of the paper after such a lapse of time

Surrogate's Court, New York County, April, 1912. [Vol. 76.

naturally caused some surprise to the father of deceased, who had long been led to suppose himself entitled to one-half of his son's property, under the statutes of this state controlling the division of such property in the event of intestacy. The father now earnestly contests the genuineness and validity of the paper in question, on this proceeding to probate it, and so successfully, that proponent's own counsel concedes that the testimony on every issuable fact in the cause is controverted. And it is so.

The late Henry Jacobs, the alleged testator, was proved beyond all controversy to have been in his lifetime, by occupation, a professional sporting book-maker. His accounts, given to some extent in evidence, disclose the varying success of this now unlawful but lucrative occupation. It naturally followed that Henry Jacobs' intimate associates during life were those who followed the same occupation, and some of them appeared on the witness stand and frankly admitted that their calling, at the times involved in the evidence, was the unlawful one mentioned. This established fact is asserted by proponent to go to the credibility of such witnesses, and the widow, here the proponent, presses this point upon me with so much insistence that I am obliged to give it due consideration in weighing the evidence. In many countries, where racing is encouraged, book-making *per se* is not unlawful. But it is proscribed here (Penal Law, § 986), and the conceded infraction of our law by a witness may go to his credibility, and to some degree bears upon the weight of his testimony. But as the contestant's witnesses also were necessarily drawn from his own station in life, I do not think I should be justified, even if the witnesses are disparaged, in disregarding such portion of their testimony as is consistent with the circumstantial evidence apparent in the cause. I know of no rule which disqualifies such witnesses from testifying to facts within their own knowledge. Code Civ. Pro., § 832. The concededly lawless character of their occupation goes only to their credibility. To this qualification of their evidence I have, as demanded, given due weight and consideration.

But if the contestant's evidence is tinctured by some marks

which go to its probative quality and effect, the same is true to some extent of the evidence offered to me upon the part of proponent. One of the two attesting witnesses to the alleged will is sought to be impeached as a person unworthy of belief, and witnesses familiar with his general reputation in the community in which he lives have sworn that they would not believe him under oath. The other attesting witness, while not·impeached directly, became an attesting witness to the will under circumstances which, if true, are so unnatural as to be most suspicious in themselves. · In this cause the genuineness of Henry Jacobs' subscription to the alleged will is not only disputed, but the evidence in regard to it is baffling beyond all precedent familiar to me. It is alternately sworn to be a forgery and genuine, with equal freedom. So proofs of the " alibi " of Henry Jacobs on material occasions, such as the date of execution, have been freely established and as freely disproved by the deliberate oaths of the different witnesses, so much so as to make all certitude as to the real fact absolutely impossible. The testimony on all points at issue is as completely at variance as a universal affirmative on the one side and a universal negative on the other can make it. There is no shade of agreement on any one point.

It is sworn on the part of the widow, who at this late day produces the will and who is the proponent here, that she lately found the will in Chicago in a little modern writing desk, formerly in the apartment of Henry Jacobs in this city. It was not a desk of the old pattern with secret drawers or hidden receptacles, but a plain, common desk. This desk after Henry Jacobs' death had for some space of time been in constant use by the widow, and when she broke up her home here she sent it on·to her brother in Chicago, where she frequently was. There the desk stood in a frequented room of this brother's house. Long after the letters of administration to the widow and when friction between the families of the widow and her husband was most acute, the widow says she found the alleged will in this familiar little desk in Chicago. This will gives all the husband's estate to her.

On the part of the contestant it is sworn that the desk in question was thoroughly searched in New York after Mr.

.Jacobs' death and that it then contained no such testamentary paper as that now propounded. But what of the paper itself? This paper on its face certainly contains one singularity: it purports to be witnessed by a person whose only permanent residence was in Chicago, a man who had rarely been in New York and who was a friend of the widow's brother residing in Chicago. This witness was not a friend of deceased, who lived in New York. On an accidental, rare and curious visit to New York, with no real motive assigned for such visit, this attesting witness says he by chance met Henry Jacobs in the street, and he then went to Mr. Jacobs' apartment and there witnessed this will. This attesting witness was in New York but once in some years, and then, by his own account, only for a few moments or hours, when he returned immediately to Chicago, whence he came. During his brief sojourn in this city he stopped nowhere, slept nowhere, and had no real business here, and during his brief stay he saw no one except the alleged testator and the other attesting witness, and them he met casually while strolling in the street of this vast city. The fact may be as this witness states, and, although the incident is so strange, I cannot say that it is impossible. But it is controverted on the part of the contestant by an *alibi* for the alleged testator, Henry Jacobs, on the very evening of the alleged execution of the will. This *alibi,* sworn to by all the intimate associates of Henry Jacobs, on the day of the alleged execution is complete, if the witnesses to it are to be believed. According to them Henry Jacobs was elsewhere at the moment assigned by proponent for the execution of the paper. That the alleged testator could have been at two places far apart at the same moment is impossible.

The testimony of the other attesting witness to the alleged will is sought to be impeached by contestant, and with some effect. He also had some association with the widow rather than with the alleged testator. But the most serious issue of all concerns the genuineness of Henry Jacobs' alleged signature to the paper in question. His associates, one and all, denounce it as a forgery, while only the experts called for the widow insist that in their opinion it is genuine. These experts were bank clerks and apparently not very expert. The

proponent, by a curious resort to a stratagem, justified by the law of this state (People v. Murphy, 135 N. Y. 450, 455; Hoag v. Wright, 174 id. 34, 43), produced on the trial a simulated signature of Henry Jacobs, made it is said in her presence for the purposes of cross-examination. This test was unfortunate for proponent in this cause, for her own experts on the stand hesitated about denouncing this conceded imposture, although they had been instructed in advance that it would be shown to them as the first of a series of signatures, the others of which would be genuine. These experts were not however professional experts, although they were perfectly competent witnesses to handwriting. I must say that the facility by which this conceded imposture was fabricated in the presence of the widow herself did not impress me favorably with the evidence adduced to establish genuineness of the signature to the will. Although such a test, as a comparison with a spurious signature, is authorized on cross-examination by the adjudications of this state, I confess that I was particularly relieved when this pseudo signature disappeared from my sight. It seemed to me that this conceded imposture had been produced in the presence of the widow herself with a suggestive facility startling to the moral sense. And yet I cannot criticize it, for in this state such conceded impostures are allowed to be used on the cross-examination of experts. People v. Murphy, 135 N. Y. 450; Hoag v. Wright, 174 id. 34. But it was a resort to a dangerous expedient in this cause, for it almost destroyed proponent's own experts, and the contestant then called none, relying in this particular on the evidence of the ordinary associates of Henry Jacobs who were most familiar with his handwriting.

I have indicated enough of the testimony and its character to demonstrate that the evidence before me in this probate cause is very confused. Whichever way I examine a material fact, I am confronted with a strenuous sworn affirmation of it on the one hand and an equally strenuous sworn denial of it on the other. In consequence I am unable to find any fact alleged by proponent, without the most serious disregard of the sworn testimony offered by the contestant. Both ver-

Surrogate's Court, New York County, April, 1912.   [Vol. 76.

sions cannot be true; one must be false. But which? This
is the enigma. This cause is in any event a sad example of the
infirmities of human testimony, although given in a court of
justice, under the most solemn adjuration. While I am al-
ways unwilling to indulge in harsh criticism of suitors who
resort to this court and am prone to make great allowance
for the weaknesses, the imagination, the obtuseness and the
forgetfulness of ordinary witnesses, I cannot allow the par-
ties in this cause to depart from this place under the mis-
taken impression that such serious discrepancies as those here
apparent in sworn testimony have not been noticed by me.
I owe this observation at least to the dignity of legal pro-
cedure and to the requirements of the corporate state whose
procedure it is.

The true solution of such a difficult situation as that just
depicted is, I think, to be found in the application of certain
relative presumptions frequently applied in this court. The
burden of proving to my satisfaction the genuineness of the
will and the validity of its execution rests on the proponent
alone. Code Civ. Pro., § 2622; Crispell v. Dubois, 4 Barb.
493; Matter of Kellum, 52 N. Y. 517; Howland v. Tay-
lor, 53 id. 627; Rollwagen v. Rollwagen, 63 id. 504, 517;
Matter of Van den Heuvel, 76 Misc. Rep. 137. This
means that the burden of proving with particularity,
by good and sufficient evidence, the *factum* of will rests on
proponent. I can be satisfied within the meaning of the stat-
ute, by no less evidence than evidence of such weight and
character. If I am satisfied by less evidence, I err in law.
Now how has the proponent discharged this burden in this
cause? By concession of her own counsel, which I referred to
at the outset, I think she has inadequately discharged the
burden resting on her.

In a testamentary cause the surrogate is entitled to con-
sider the facts regarding the custody and production of the
testamentary paper, *i. e.,* from whom and whence it came.
Miller v. Brown, 2 Hagg. 209; Braham v. Burchell, 3
Add. 235. At times such custody is most important if the
genuineness of a document is at issue. Taylor Ev., § 660.
Now, it appears in this cause that it was only long after the

death of Mr. Henry Jacobs, the alleged testator, that the
script purporting to bear his signature came to light, and all
that time, constructively at least, it was in the proponent's
own custody in a desk belonging to her. Had the disputed
script been produced from a fast-locked repository of the al-
leged testator's own, to which none other had access, this
would have been a most important fact for my consideration.
But it was not shown to be so. All the circumstances relative
to the custody of the writing propounded, from its inception
to its production, are inconsistent with a testamentary char-
acter. The alleged testator took no care of it whatever. He
neither put it away nor locked it up. In other words, all the
circumstances shown concerning the custody of the paper in
question make against the paper rather than for its validity.
It is always within my jurisdiction to inquire particularly
into the circumstances attending the possession and custody
of a testamentary paper propounded to me as a will. Code
Civ. Pro. § 2622.

I do not, however, find that the will produced in this cause
is a forgery, for that is not established. I say this because
I am unwilling that the widow should rest under any unjust
imputation on this point. While I do not in strictness apply
the presumption to this cause, and do not place any conclu-
sion on it, yet to my mind the presumption of innocence
should always be considered in a civil cause if for no other
reason than due consideration to the tranquil and orderly
conduct of human affairs, although this is in substance, but
I think not in essence, denied in this and a few other juris-
dictions. The extent of the presumption of innocence in civil
causes is sometimes, I believe, misunderstood. It is the rule
in England that wherever a charge of crime is involved,
whether it be collaterally in a civil case, or directly in a
criminal case, the burden of proving guilt beyond reasonable
doubt lies on the person who asserts it (Williams v. East
India Company, 3 East, 192; Ross v. Hunter, 4 T. R. 33;
Best Ev. [3d Am. ed.], § 346), whereas in this state it is
held that if an assertion of crime is made in a civil suit, or
collaterally, in other words, a mere preponderance of evidence
will suffice to establish it. Seybolt v. N. Y., L.

26

E. & W. R. Co., 95 N. Y. 462; Farmers L. &
T. Co. v. Siefke, 144 id. 355; Kurz v. Doerr, 180
id. 88; Johnson Service Co. v. Maclernon, 142 App.
Div. 677, 679. It is the rule of New York on this
point which of course is binding on me. Every court of orig-
inal jurisdiction is bound absolutely by the authoritative
precedents established by the highest courts of the state, but
only to the extent that such highest court in turn is bound by
its own decisions. But the declaration of the Court of Ap-
peals in regard to the presumption of innocence I conceive
to concern the weight of evidence only in civil cases, and I
do not deem it a pronouncement, as some do, that in civil
causes there is no presumption of innocence whatever. A
total disregard of this great presumption in civil causes would
be contrary to all reason. It would tend to substitute a pre-
sumption of guilt in civil cases for a presumption of inno-
cence, for, if in civil cases there were no presumption either
way, a litigant might have the burden of proving his own
innocence in the first instance, which is a conception shock-
ing to the legal sense, and contrary to the principles under-
lying the development of the common law and any procedure
based on it. Williams v. East India Co., 3 East, 192; Coll-
yer v. Collyer, 110 N. Y. at page 486; Matter of O'Sullivan,
122 App. Div. 527, 534; Matter of Harris, N. Y. L. J., July
17, 1911. The rationale of the common law is regarded as
the safety of the institutions of the state, and this most
salutary presumption of innocence of crime is a fundamental
part of the common law. In a republic where denigration
of character is a characteristic phenomenon, by reason of
operative causes well understood by students of institutions,
no other presumption of the common law is more important
than that of innocence. To my mind the proponent is en-
titled to the benefit of it. The cases I have cited go to the
weight of evidence, not to the denial of the maxim itself in
civil causes. But whether my reading of the applications is
or is not accurate, it is not upon this point that I rest my
judgment.

　The proponent has failed to fulfill the burdens resting on
her in this cause and I am unable to find from the contro-

verted evidence that the script propounded is in truth and in fact the last will and testament of Henry Jacobs, deceased. The probate sought is therefore denied.

Decreed accordingly.     .