(73 Misc. Rep. 325.)

### In re GANNON et al.

(Surrogate's Court, New York County. August, 1911.)

1. WILLS (§ 293*)—PROBATE AND REVOCATION—ADMISSIBILITY OF EVIDENCE.
   In a will contest, where there was an allegation ore tenus that the will was a part of a general plan to obtain possession of the estate of the testator, evidence of other transactions may be relevant to the principal charge.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 666–672, 675–678; Dec. Dig. § 293.*]

2. WILLS (§ 166*)—FRAUD—SUFFICIENCY OF EVIDENCE.
   Where fraud and conspiracy are charged in a testamentary cause, the precise mode of committing the fraud need not be proved, if the circumstances actually proved raise a legitimate presumption of fraud.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. § 421; Dec. Dig. § 166.*]

3. WILLS (§ 302*)—PROBATE AND REVOCATION—PROOF OF EXECUTION.
   On an application to revoke the probate of a will, evidence *held* to show knowledge of the testatrix of the contents of the will so as to render her declaration that it was her last will and testament a sufficient publication thereof.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. § 702; Dec. Dig. § 302.*]

4. WILLS (§ 302*)—EXECUTION—SUFFICIENCY OF EVIDENCE.
   Ordinarily the formal execution of a will by one who can read and write imports a knowledge of the contents, and this presumption must prevail until counterbalanced by very satisfactory evidence to the contrary, but such presumption is not always indulged in; and where a testator is of low grade of capacity, owing to illness or other cause, a different degree of proof is required in order to satisfy the court that the instrument contains the real intentions of deceased.

   [Ed. Note.—For other cases, see Wills, Cent. Dig. § 702; Dec. Dig. § 302.*]

Application by Mary Ann Gannon and others to revoke the probate of the last will of Mary T. Sprowl. Application denied, and probate decreed.

Effingham L. Holywell (J. Stewart Ross, of counsel), for petitioners.

Rastus S. Ransom, for contestants.

FOWLER, S. This proceeding comes before the surrogate on allegations to revoke the probate of a will. In such an application, under the former law here applicable, the executor, or persons interested against the allegations, must prove the will de novo by original proofs. This proceeding is very like the former application to rescind the conclusion of a probate court.

[1] On the hearing in this cause great latitude was permitted the petitioners for revocation, because of an allegation ore tenus tendered in court that the will was part of a general plan to obtain possession of the estate of Mary T. Sprowl, and that the will and sev-

eral conveyances were procured from Mrs. Sprowl by the proponents of the will as the result of a conspiracy or general scheme to obtain the estate of testatrix. This is more than a charge of undue influence. On the trial of such an issue evidence of other transactions besides the will, but in furtherance of the common enterprise or scheme, is sometimes held to be relevant to the principal charge. The abstract right of those so alleging conspiracy to prove such other acts was urged on the surrogate on the hearing, and, over the protest of the proponents, the surrogate deemed it proper to admit rather than to exclude proof of any facts tending to substantiate such allegations. Lewis v. Mason, 109 Mass. 169; Somes v. Skinner, 16 Mass. 348; Bottomley v. United States, 1 Story, 135, 143, Fed. Cas. No. 1,689; Packer v. United States, 106 Fed. 906, 46 C. C. A. 35; Commonwealth v. Eastman, 1 Cush. (Mass.) 189, 216, 48 Am. Dec. 596.

The surrogate doubtless has the power to require such an allegation to be put in writing (Code Civ. Proc. § 2633), if the written objections to the probate do not by implication permit such proofs. The issues presented by the ordinary objections to probate are sometimes too general in character to fulfill the purposes of a pleading, and to afford proper notice to the other party. The former practice in probate proceedings required each position of respondents to be set forth in a separate allegation which was duly considered as to its competency and sufficiency before the taking of the depositions based on such allegation. The surrogate has no doubt that such practice contributed to the excellence of the decisions in testamentary causes in former times. Mr. Bradford, fortunately once the surrogate for this county, frequently directed the positions of parties before him to be tendered in the form of written allegations. The pleading of contestants in Surrogates' Courts under the present practice is largely ore tenus, and does not, as I think I observe, tend to precision. Indeed, this practice may account in some degree for the informality often observable in the records of proceedings in probate courts where neither the surrogate nor the petitioners are precisely advised in advance of the material facts on which objectors rely. The proponents, however, did not take exception in this cause to the fact that the allegation of conspiracy was oral, although it was perhaps a surprise to them, as the proceeding was one to revoke a probate for other allegations specifically contained in the petition.

[2] Where fraud and conspiracy are charged in a testamentary cause, it is generally conceded that the party alleging it has a latitude hardly to be conceded in other causes involving only the factum of will. When fraud is charged, it is difficult to say that any facts bear too slightly on the issue, if they bear at all. Lock v. Denner, 1 Add. Ecc. Rep. 357. The precise mode of committing the fraud need not be proved, if the circumstances actually proved raise a legitimate presumption of fraud. McLaughlin v. McDevitt, 63 N. Y. 220.

The proofs taken under the surrogate's ruling, permitting proof of the conspiracy alleged ore tenus, were possibly more extended in this cause than was necessary, as, on the final submission of the cause,

the experienced counsel for the petitioners to revoke the probate very properly narrows his contentions to the insufficiency of the proofs bearing on the factum of the will. The issue before me, therefore, is now confined to the factum of the will.

Mrs. Sprowl, the maker of the will in question, was a woman upward of 60 years of age when her will was executed. Much testimony was addressed to her precise situation in life and to the character of the persons composing her household. I shall advert to these things only in so far as they have a legal bearing. It appears that the testatrix had long lived in the city of New York, where the will was made. At the time of making her will she had living no nearer blood relations than a first and several second cousins, none of whom was then apparently on terms of affectionate or even familiar intercourse with the testatrix. The contesting relatives, in any event, in her lifetime seem to have left Mrs. Sprowl much alone. In the later years of her life, and for some time before her death, Mrs. Sprowl's ordinary household consisted mainly of her daughter-in-law, Mrs. Shields, the widow of a deceased son of Mrs. Sprowl, and a son of Mrs. Shields. · This son of Mrs. Sprowl's daughter-in-law was proven to be not of the blood of testatrix. He was not, in fact, her grandson. But from infancy and during the entire life of his stepfather, Mrs. Sprowl's son, he had been an inmate of Mrs. Sprowl's house, and he continued to be such inmate for a considerable part of the time thereafter. There is some evidence that Mrs. Sprowl spoke of this young man (the son of Mrs. Shields) as her own grandson. In all events the relationship, real or factitious, between Mrs. Sprowl and the young person in question was intimate (and this is the important point), indeed, so intimate that it doubtless assumed some semblance of the relationship ordinarily existing between an elderly grandmother and her grandson. The testimony too plainly discloses that Mrs. Sprowl's was not a substantial household. The existence of some of its inmates was not an ordinary one. Even their names and their family relationships were somewhat more fluctuating and elusive, perhaps, than ordinary conventions permit. But the surrogate ought, I think, to assume that the fact that such persons were members of the same household had some benevolent influence on their feelings toward one another, and that the ties, whether actual or adoptive, existing between Mrs. Sprowl and the young man who was the principal beneficiary under her testamentary dispositions were not altogether destitute of that real affection or interest which mere intimacy and the trials and burdens of a life borne together ordinarily develop among the inmates of one household. It would seem that the fact of a family life lived in common is the one which is most pertinent to the question of the propriety of the will now before me. This fact I am bound to consider, as it was fully established on the hearing.

No matter what the testimony tends to show concerning the abnormal idiosyncrasies or the peculiar occupations or pursuits of this perhaps exceptional household, the surrogate ought not to assume that the deceased and those living under her care and protection were for that reason altogether destitute of those reciprocal interests in

one another which mankind ordinarily attributes to the members of a common household. On the contrary, the true inference would seem to the surrogate to be that those, driven of necessity by the rigorous rules of civilized life to their own exclusive companionship, would possess their narrower interests more closely in common. This brings me to the conclusion that the evidence presented in this cause does not disclose to me a more natural object of Mrs. Sprowl's bounty than the young man who is the principal legatee under her will. More I need not say concerning the very extended testimony pressed on me as bearing on the relationships inter se of the household of the testatrix.

If for the moment I assume what I am most reluctant to do, the truth of the contestants' testimony, tending to show that the deceased occupied an exceptional status in the community, with her actual surroundings in accordance, what then in law is the effect of such an assumption, unkind as it is, to the dead who can no longer offer an excuse or defense? The responsibility for such an ungracious assumption must rest with the contestants, whose relative the deceased was. It is they who assert that her life was exceptional, although they are now here, seeking to take to themselves what they allege in effect are the shocking wages of the moral depravity of one of their own blood.

In every great city of the world exist, doubtless, persons of exceptional status. There the peculiar isolation, incident to vastness alone, shelters them longer from exposure than do smaller communities where the inexorable moral light, though not a whit more powerful in the end, is more easily concentrated. But I know of no law which in this state deprives such persons by mere assertion of the ordinary rights in and to their own property, or which entitles such rights, in the abstract, to less consideration from the courts of justice. An argument founded on a contrary hypothesis the surrogate would feel bound to reject. Charges of conspiracy, undue influence, and of fraud by or against such persons must be proved with the same particularity in their case as in other instances. The presumption of innocence, to its everlasting honor, is, under the wise system of jurisprudence fortunately established in this state, as applicable to mere charges against such persons as it would be were their lives conceded to be blameless. Conduct in the abstract courts cannot try under the established rules of law. If the charges are at issue and proven, of course there is no room for presumption.

Having now, as I trust, considered sufficiently the inferences which are pressed on me as relevant from the situation disclosed, or sought to be disclosed, by some of the testimony taken on the part of the contestants, we may proceed with less fear of error to the consideration of the real question in this cause—the factum of the will. Was it, or was it not, the will of Mrs. Sprowl? That is the sole question for the surrogate.

The paper, purporting to be the will of Mrs. Sprowl, was executed at her last residence in the city of New York on the 19th day of November, 1909. At the time of such execution Mrs. Sprowl was con-

fined to her bed in her small bedchamber, not larger than 15 feet broad by 24 feet in depth. There were then present in this room the testatrix herself, Mr. Shields, her principal beneficiary, the three attesting witnesses of the will, one of these being her medical attendant, and also Mrs. Sprowl's agent or man of business, who had drawn up her will. This agent had been such for 25 years, obviously to the satisfaction of his employer, and he it was who prepared, as I think, at her dictation and procurement, the will in controversy. I cannot impute to this agent such an interest in this will as deprives his testimony under oath of all value. He certainly in her lifetime possessed the confidence of the testatrix, whatever she was or was not, and she naturally, I think, turned to him when she came at last to the solemn necessity of making her will. This agent did not write himself in the will except to a trifling extent; the bequest to him being his own note of hand for $250 held by testatrix, and the gift of a small burial lot. As he had been, no doubt, a satisfactory agent of the considerable property of testatrix for upward of 25 years, the surrogate is unable to say that such gift is in itself so unnatural or so unreasonable as to impose on proponents burdens of evidence out of the common. But I shall consider this point more at large later. The attesting witnesses were all respectable persons, in legal presumption, one of them, indeed, the qualified physician of the testatrix, with no private interests to subserve. I can see nothing in the attestation of the instrument out of the ordinary or which tends to cast suspicion on the entire good faith of the attestation itself.

The contestants do not seriously contend that there was not a substantial compliance with the statute of wills in the course of the execution of the paper propounded as the will of Mrs. Sprowl. The prescribed formalities of a written will or testament are, it seems, adequately made out in the proofs by the two attesting witnesses called to the stand. The will was sufficiently subscribed by the testatrix at the end thereof, in the presence of the attesting witnesses. It is also made out that the attesting witnesses signed their names as witnesses thereto at the end of the will at the request of the testatrix. The separate elements of execution were all performed at the same session in the little room described, and I think the unity of the transaction is complete and that independently of the evidence, which is sufficient, the rightful order of the performance of the various ceremonies would in any event be presumed by the court under well-established principles. It is not seriously contended by contestants that at the time of such execution the testatrix was not in possession of her ordinary faculties and of a sound and disposing mind. She was then afflicted by nephritis, and from this dire disease she died on the day following the execution of the will in question. The real objection of contestants to the probate relates, I think, to the sufficiency of the publication by the testatrix of the paper in question, and for that reason I shall confine my further consideration to that particular element of a sufficient execution of the testamentary paper here propounded.

[3] The statute of wills requires that at the time of making her subscription, or at the time of acknowledging the same, the testatrix should have declared the instrument so subscribed by her to be her last will and testament. This requirement of the statute now makes such a declaration the supreme evidence of a publication of a will, or, in other words, the supreme evidence of animus testandi. If the contents of the paper were unknown to the testatrix at the time of publication, or were fraudulently concealed from, or imparted to her, her declaration or its equivalent, animus testandi, is not made out by proponents, and the probate must fail. Such is the contention of the contestants before me.

It has been said by a high authority on the subject of testamentary law that it is essential to the validity of a will that at the time of its execution the testator should know and approve of its contents. And, whenever any ground for suspicion exists, the burden of proving that the will was the voluntary and conscious act of the testatrix lies on him who propounds the will. Jarman, Wills (6th Ed.) 310. We may assume, I think, that this general statement of law is not inapplicable to an execution of a will under the present statute of wills now in force in this state. Rollwagen v. Rollwagen, 63 N. Y. 517. As the will in controversy was drawn up by one who takes a small benefit under it, the rules relative to a person who "se scripsit heredem" may possibly apply and cast upon the proponents the burden of proving the execution of this will by evidence of a more clear and satisfactory character than is required in cases destitute of that feature. Delafield v. Parish, 25 N. Y. 35; Matter of Westurn, 60 Hun, 298, 14 N. Y. Supp. 753; Matter of Smith, 95 N. Y. 516, 522; 1 Redf. Wills, 515. But I take it that a testamentary gift to the draftsman of a will is a suspicious circumstance only according to the degree of relationship or the intimacy of the parties, and the amount of the legacy. In other words, suspicion from such relations and benefits depends on the circumstances of a particular case. It is obvious that, if a millionaire leave to the draftsman of his will a gold ring, such legatee, if he had written the will, would be within the letter of such rule, but not within its true spirit.

The question, then, before me is whether an additional burden is cast on proponents in this cause because an agent of long standing who was the draftsman of the will of his employer has written himself in her will as a legatee for a small debt overdue by him to testatrix, and also for a burial lot? I do not think so. Post v. Mason, 91 N. Y. 539, 547, 548, 549, 43 Am. Rep. 689. But, if we assume that the testamentary gift in question does so operate in this cause, the main effect of the assumption will be to cast upon the surrogate a more than usually rigorous scrutiny of the evidence adduced (Barry v. Butlin, 1 Curt. Ecc. 637, approved 91 N. Y. 547, 43 Am. Rep. 689), and this scrutiny I am willing in all events to give, and even to place on proponents the more extended burden, sometimes properly applicable in causes where the draftsman of a will takes a substantial benefit under its provisions.

Now, on looking at the testimony bearing on such an issue, I find that it was the physician in attendance, a stranger to the legatees, who first suggested to the testatrix the propriety of her making her will and also of consulting a clergyman or some spiritual adviser. Could such suggestion have come from a more disinterested source or have been a more delicate intimation to the patient that her mortal end was near? It would seem not. Acting on this intimation, testatrix accordingly saw a clergyman and also proceeded to the making of her will. From the entire evidence in this cause, bearing on the precise authorship of the will, the surrogate is unable to conclude that the will was the act of the legatees and not of the testatrix.

To come finally to the real question at issue in this cause, was the knowledge of the contents of this particular will by the testatrix sufficiently established to make out a "declaration" or animus testandi, or publication on her part, it being conceived by the surrogate that these three terms are now equivalents in testamentary law, and under our statute of wills? At the time of the execution in question Mrs. Sprowl was fast approaching her end, and in such a situation it has doubtless been held that strong proof is required that the contents of the will were known to the testatrix, and that the will was her spontaneous act. I shall give to the contestants in this cause the full benefit of what I conceive to be a reasonable rule of testamentary law generally. Jarman, Wills (6th Ed.) 49; Parks v. Ollat, 2 Phill. 323; Barry v. Butlin, 1 Curt. Ecc. 327.

[4] In ordinary causes the formal execution of a will by one who can read and write imports a knowledge of the contents, and this presumption must prevail until counterbalanced by very satisfactory evidence to the contrary. 1 Redf. Wills, 228; Schouler, Wills, § 247; Penton v. Williams, 2 Curt. 530, quoted, or intended so to be, in Rollwagen v. Rollwagen, 63 N. Y. 517. But such a presumption is not always indulged in, and where a testator is of a low grade of capacity, owing to illness or other cause, a different degree of proof is required in order to satisfy the court that the instrument contains the real intentions of deceased. Thus in a case where the will is prepared or procured by one interested in its provisions the proponent must go farther, and show knowledge by the testator of the contents of the will. Matter of Green, 67 Hun, 527, 532, 22 N. Y. Supp. 1112.

Now, what were the facts here established as to the knowledge of the testatrix of the contents of the particular instrument now under consideration by me? The draftsman of the papers was called to the stand by contestants, although they first procured an order for his examination as a "surrogate's witness," and claim that they are thereby made free to reject or accept his testimony as they see fit. The draftsman so called in any event testified that he first made a draft at the dictation of testatrix and read it over to her, and that she said it was all right. After he had written the will, he took it up to her, and then read it to her before execution. This would be sufficient prima facie evidence of knowledge of the contents of a testamentary paper if the testatrix had been blind, and this she was

not. I find nothing in the record contradicting this evidence. The testatrix spoke English only, and the will was in English, thus differing from the Lederer decision, cited to me.

The surrogate, in view of this testimony, wholly uncontradicted, is, I think, constrained to conclude that at the time the testatrix declared the paper in controversy to be her will she was fully aware of its contents, and that the statutory "declaration," animus testandi, is apparent in this cause.

My conclusion is that the will of Mrs. Sprowl is adequately established, and that the probate thereof ought not to be rescinded on this application to revoke it. There will be no costs allowed herein. Let findings and decree herein, in conformity herewith, be submitted to the surrogate for his signature. Probate decreed.