In the Matter of Proving the Last Will and Testament and Codicil Thereto of ABBY STRONG, Deceased.

JAMES A. GOODRICH, Proponent, Respondent; JERUSHA STRONG and LEVI M. STRONG, Contestants, Appellants.

Third Department, September 13, 1917.

Will — testamentary incapacity — execution of codicil during temporary incompetency followed by restoration to competency — republication essential — evidence — opinion of subscribing witnesses — burden of proof to establish testamentary capacity — erroneous direction of verdict — when issue should be left to jury.

If a testatrix was mentally incompetent at the time of executing a codicil, subsequent restoration to competency, no matter how long continued, does not give efficacy to the void codicil unless after restoration to competency there was a republication of the instrument in the manner required by the statute.

Opinions of witnesses to a will as to the competency of the testatrix are not conclusive on the court where they are the result of reasoning processes of their own minds rather than inferences based on what the testatrix actually did or said.

The burden of proof rests on the proponents to establish mental competency of the testatrix at the time of the execution of the codicil, and where a verdict for the proponents was directed by the court the contestants on appeal are entitled to the most favorable inferences which are properly deducible from the evidence.

Under the present law the determination of testamentary capacity is a question of fact for the jury and the court is not justified in withdrawing the issue from the jury if on the entire evidence reasonable men might draw different inferences.   It is only when a verdict must be set aside as unsup-

ported by the evidence, and not when it may be set aside for that reason,
that a verdict may be directed.

Evidence examined, and *held*, to require a submission of the issue of testamentary incapacity to the jury and that a direction of a verdict for the proponents by the court was error.

KELLOGG, P. J., dissented.

APPEAL by the contestants, Jerusha Strong and another, from an order of the Supreme Court, entered in the office of the clerk of the county of Schenectady on the 6th day of July, 1916; directing a verdict herein in favor of the proponent, after the jury had disagreed, and also from a decree of the Surrogate's Court of the county of Schenectady, entered in the office of said Surrogate's Court on the 7th day of July, 1916, admitting said letter and codicil to probate, pursuant to the said order.

*Daniel Naylon, Jr.,* and *John D. Miller,* for the appellants.

*Edward D. Cutler* [*William E. Bennett, Arthur M. King* and *Edgar T. Brackett* of counsel], for the respondent.

COCHRANE, J.:

Abby Strong died November 25, 1915, leaving a last will and testament executed February 22, 1906, and a written instrument purporting to be a codicil thereto executed October 20, 1910. The will is not opposed. Objections having been filed to the codicil and a jury trial having been demanded, the surrogate pursuant to statute certified to the Supreme Court the questions to be determined. After a trial of great length the jury disagreed and it was thereupon stipulated by the parties that the court might reserve decision on the proponent's motion for the direction of a verdict and that if it concluded that such direction was proper it might make such direction in all respects as if the jury were present. The court thereupon took the case under advisement and subsequently made the order appealed from directing a verdict that the decedent at the time of the execution of the codicil was mentally competent to make the same and that the same was not obtained by undue influence and was executed with the formalities required by law.

It is not urged on this appeal that the codicil was the

result of undue influence or that it was not executed with the formalities required by law, but the claim is made that the competency of the deceased could not be determined by the court as a matter of law and that the evidence was such as to require the submission of that question to a jury.

Abby Strong at the time she executed the codicil was seventy-four years old. She was the last of four sisters, none of whom ever married. They resided together formerly on a farm where one sister died, but in the year 1882 or 1883 the three survivors removed to the city of Schenectady and continued to live together until they severally died. Another sister died in 1905. On February 22, 1906, the remaining sisters, Jerusha and Abby, both made their wills substantially similar except that each made the other her residuary legatee and executrix. Legacies were bequeathed in each will to various institutions and individuals amounting to about $25,000. Jerusha died March 20, 1910, and by virtue of her said will Abby received her residuary estate which together with what she then owned made her worth approximately $140,000. She had no relatives nearer than cousins. The contestants are two of her next of kin. October 20, 1910, seven months after the death of Jerusha, she made the codicil in question wherein after bequeathing some minor legacies in addition to those bequeathed in her original will, she gave all of her residuary estate, about $100,000, to two missionary societies of the Methodist Episcopal church. She had been for many years a devoted member of the Methodist church and an attendant of its various services.

About two years prior to the execution of the codicil the deceased developed arterio-sclerosis, which is described as having been progressive. She became subject to physical attacks or seizures accompanied with convulsions which sometimes caused her to fall and rendered her unconscious. Usually these seizures came on at night and would leave her in an unconscious condition for several hours, but the effects thereof continued longer. During the year 1910 she was subject sometimes to three of these attacks in a week and sometimes there would be an interval of two weeks between the attacks. These continued until her death, although she died from another cause. She frothed and emitted from her mouth

a yellow colored fluid with an offensive odor. Dr. Vander Bogert, one of the subscribing witnesses to the codicil, was her attending physician up to 1909, and he testified as follows: "There were times when she was apparently perfectly lucid I think. There were other times when she was suffering from these amnestic attacks, loss of memory. At times when I had seen her she would be practically dazed. At other times, as far as I know, perfectly well." He further says that the "hazy conditions" continued possibly twenty-four to forty-eight hours. He attributed her falls to a lack of co-ordination and in response to the question as to whether it was any indication of mental disturbance replied, "Well, I think it means a lapse of the brain control," and stated that it did not necessarily interfere with the function of the mind between the lapses. Mrs. Raino, a domestic nurse, attended Jerusha Strong during her last illness and after her death continued with her sister Abby until after the time of the execution of the codicil except for a period of about six weeks beginning in May. The only other occupant of the house was a domestic. These two witnesses saw more of the deceased during this period than any other person and stated with much particularity the frequency of the attacks which have been mentioned and the effects thereof. She would generally remain in bed the following day and be unresponsive to what was said to her and complain of pains and a burning sensation in her head. Numerous instances are given when she failed to recognize acquaintances of many years under circumstances indicating not visual but mental defect.

The alienists of the respondent admit that during the time of these attacks and for some period subsequently the deceased was irrational and I do not understand that any one claims the contrary.

Much testimony was given on both sides bearing on the mental condition of the deceased in the intervals between these attacks. Instances of abnormal conduct were related which need not be here detailed. It appears, however, that generally she directed her own household affairs, and purchased the family supplies and paid therefor, and paid other bills and conducted various business transactions. Sometimes she received interest on securities belonging to her or the

estate of her sister and gave receipts therefor written by herself with a precision and accuracy indicating sufficient ability to conduct those transactions. Two medical experts called by the appellants testified in answer to hypothetical questions in effect that she was mentally deficient to such an extent as to support the inference that she had not testamentary capacity. While it is true that the hypothetical questions were incomplete in not including all of the acts of the deceased which were clearly established, the witnesses nevertheless testified that they took into consideration the fact that she conducted her household affairs, paid for the supplies, and received and receipted for interest, and one of them said he assumed that all of her acts not included in the question were rational. They differentiated between acts which were largely routine and which she had been accustomed to do for many years, such as receiving payments of interest or making household purchases, and the more solemn and unusual act of making a disposition of an entire estate. But it is unnecessary to determine on this appeal whether the testimony of the medical experts of the appellants irrespective of the other evidence was sufficient to require the submission of the case to the jury.

The trial justice was of the opinion that it was necessary for the appellants to establish that the mind of the deceased was permanently impaired when the codicil was executed. He says: " If she was incompetent on October 20, 1910, it was because she had then come into a permanently enfeebled condition of mind," and refers to many subsequent and long periods when she was shown to be competent and rational as " a complete answer to any contention that her·mind was permanently impaired as early as 1910." (See 99 Misc. Rep. 251.) This statement of the trial justice was apparently predicated on the hypothesis that when she executed the codicil the deceased was free from the effects of her characteristic physical attacks above described and if his hypothesis were correct perhaps his conclusion based thereon would also be correct. But the real question was whether the deceased " at the time of executing it [the codicil] was in all respects competent to make a will." (Code Civ. Proc. § 2614.) If she was in a condition of incompetency when she executed

the codicil a subsequent restoration of competency no matter how long continued does not lend efficacy to the void codicil, *first*, because the evidence shows conclusively that she never thereafter saw the codicil and it does not appear that she ever made any statement indicating any realization of its existence much less any comprehension of its provisions, and *second*, because a will made during a period of incompetency can only acquire validity by a subsequent republication at a time of competency. (1 Wms. Exrs. [7th Am. ed.] 267; *Cook* v. *White*, 43 App. Div. 388, 392.) There must be a conscious and intelligent act of publication conforming to the statutory requirements to give validity to a will.

We, therefore, approach a consideration of the evidence bearing on the mental condition of the deceased at the particular time when she executed the codicil. Four days prior thereto Bishop Bashford of the Methodist Episcopal church and the Rev. Dr. Adams, her pastor, called on her to solicit a subscription for the cause of missions. She expressed her interest in the cause and spoke of making a will and said that she contemplated devoting part of her property to that purpose and promised an immediate contribution of $1,000. Bishop Bashford suggested the desirability of not procrastinating making her will and advocated the cause in which he was interested. Three days thereafter Dr. Adams again called and received from her a check for the $1,000 which she had promised. There is no suggestion in these occurrences of improper influence or overzealous importunity but the suggestion arises that perhaps the codicil was not the spontaneous or unaided production of her own mind. She received her visitors on those occasions in her parlor and discussed the subject uppermost in their minds as well as other incidental subjects in a manner which impressed them as rational. The day after the last visit mentioned she executed the codicil. In the afternoon of that day she was so ill that two physicians, Dr. Vander Bogert and Dr. Pearson, were in consultation at her house. Both of these physicians were witnesses for the proponent, but neither gives any explanation of her illness nor what treatment was given or remedies applied. The particular date is fixed by the record book of Dr. Pearson. There is evidence that she had pre-

viously or about that time suffered from a stoppage of the bowels, but Dr. Vander Bogert specifically disclaims that he treated her for that ailment. The nurse, Mrs. Raino, says that Miss Strong told her on that day that she intended to make her will and that she would be visited on that evening by some persons who were coming for that purpose. On the following day she told the nurse that those persons had been there, giving their names, but it does not clearly appear that her will or codicil was then mentioned. About seven o'clock in the evening Mr. Goodrich, the draftsman of the codicil, who had been the counsel of Miss Strong for twenty-five years, and who was the executor named in the codicil, Dr. Vander Bogert and Mr. Lyon, the subscribing witnesses, went to her sick room and the codicil was executed. She arose from her bed after their arrival, clad in her usual night clothes, walked three or four feet to a table, signed the codicil, answered the usual questions attending its execution, and went back to bed before the witnesses took their departure. The codicil was not read to or by her at that time. Mr. Lyon was in her sick room alone with her for some minutes awaiting the arrival of the other witness for whom Mr. Goodrich had gone. None of these witnesses reproduced any conversation with the sick woman at that time, although as stated Mr. Lyon was alone with her for some appreciable time. Her answers to the questions attending the formalities of the execution of the codicil were categorical. The witnesses to the codicil and Dr. Pearson described her on that day as rational, but it is apparent that the opinions of these witnesses are the results of reasoning processes of their own minds rather than inferences based on what the deceased actually did or said, because none of these witnesses is able to recall any conversation reflecting her mental condition, and the physicians made no examination with reference thereto. These opinions clearly are not conclusive on the court.

The burden of proof rested on the proponent to establish mental competency at the time of the execution of the codicil. (*Dobie* v. *Armstrong*, 160 N. Y. 584, 590; *Matter of Goodwin*, 95 App. Div. 183; *Matter of Schreiber*, 112 id. 495; *Matter of Van Den Heuvel*, 76 Misc. Rep. 137, 146.)

A verdict having been directed, the appellants are entitled to the most favorable inferences which are properly deducible from the evidence. (*McNally* v. *Phœnix Insurance Company*, 137 N. Y. 389.)

The law now gives the determination of questions of fact in a case like this to the arbitrament of a jury and the court is not justified in withdrawing such questions from the consideration of a jury, if, upon a consideration of the entire evidence, reasonable men might draw different inferences. (*Tousey* v. *Hastings*, 194 N. Y. 79; *Matter of Case*, 214 id. 199, 203.)

It is only when a verdict *must* be set aside as unsupported by the evidence and not when it *may* be set aside for that reason that a verdict may be directed. (*Getty* v. *Williams Silver Company*, 221 N. Y. 34, 39.)

In the light of the foregoing legal rules and bearing in mind that there were periods when Miss Strong was unquestionably incompetent and that these periods came on with suddenness and frequency and were due to a failure of brain control and that at such times she was in a " hazy " condition from twenty-four to forty-eight hours, that she was so ill several hours before the execution of the codicil as to require the presence of two physicians in consultation, although the day before she had in apparently good health delivered to Dr. Adams the check for $1,000, and that the two physicians do not negative the inference that her illness was one of these characteristic attacks which undeniably rendered her incompetent for some time subsequently, and in view of what occurred in her sick room when the codicil was executed and that the subscribing witnesses are unable to give persuasive testimony demonstrating her mental clarity at that time, it cannot be said as a matter of law that her mind was not in such a confused or nebulous condition when she executed the codicil, as the result of one of those attacks that she was then incompetent to execute it. Such an inference would not be unreasonable as matter of law.

Authorities cited by the respondent have no application to such a state of facts as exist here. Some of them arose under former section 2653a of the Code of Civil Procedure, where the burden of proof was placed on the contestants, and

all of them are dissimilar in fact. The correct rule applicable to this case is stated in *Hagan* v. *Sone* (174 N. Y. 317), at p. 323) as follows: " The plaintiff's proof might not have satisfied the jury that the deceased was either incompetent to make a will or subjected to any undue influence, but there was enough of it to require us to hold that the jury was the branch of the court that the law required to pass upon it. Questions of fact arising in an action to determine the validity of a will are no different in this respect from questions of fact in any other case. When evidence is given of such a character that different inferences may fairly and reasonably be drawn from it, the fact must be determined by the jury. The good sense of the jury, when aided by proper instructions from the court, is the best and, indeed, the only protection that litigants ordinarily have in the determination of issues of fact, depending upon conflicting evidence, even when such issues arise in actions to determine the validity of the most important testamentary instruments."

We are not unmindful that in a case free from undue influence such as this seems to be not a very high degree of mentality is required to make a valid will. But here we have a case where it conclusively appears that the deceased was frequently incompetent for the performance of such an act and the circumstances existing at the particular time when she executed the codicil are such that reasonable men might infer that such condition then existed. We express no opinion as to the merits of the controversy, but hold merely that the evidence was such as to require the submission of the controversy to the jury and that the direction of a verdict by the court was error.

The order and decree, so far as it admits to probate the codicil, should be reversed, and a new trial granted, with costs to the appellants, payable out of the estate, to abide the event.

All concurred, except KELLOGG, P. J., who dissented.

Order and decree, so far as it admits to probate the codicil, reversed, and new trial granted, with costs to the appellants, payable out of the estate, to abide the event.