In the Matter of the Probate of a Paper Writing Purporting to Be the Last Will and Testament of THERESA ALFAYA, Deceased.

Surrogate's Court, Westchester County, March, 1924.

**Wills — probate denied on ground that paper offered was not will of decedent — decedent was mentally incapacitated from making will — execution of paper was induced by fraud and undue influence on part of proponent.**

Probate must be denied to a paper offered as the last will and testament of a decedent on the ground that the paper offered was not the will of decedent since it appears that the proponent, who is the sole legatee under the will, first made the acquaintance of the decedent, a woman then eighty-four years of age and in very poor health, in August, 1923, and was very attentive to the decedent for several weeks; that in October following she engaged a lawyer, who drafted the decedent's will under the directions of the proponent; that the will recited that no bequest was made to decedent's sister inasmuch as she had ample means for her support, which statement was not true; that the proponent had the will signed by the decedent in the presence of one witness and on the same or following day called the attending physician who acted as a witness to the will also, but the attestation clause was not signed in the presence of the decedent but in the office of one of the witnesses; and that there is no proof offered by the proponent that the decedent knew the contents of the will or that the will had ever been read to the decedent or was ever in her possession except at the time when it was signed by her.

Under the circumstances recited the ordinary proof of the factum of the will is not sufficient to satisfy the surrogate that it was the will of the decedent. It was incumbent upon the proponent to establish by competent evidence either that the will was read to the decedent and that she knew its contents or that she had intelligent knowledge thereof, and that burden the proponent did not meet.

While there was expert testimony both that the decedent was and was not mentally capable of making a will, still in view of the circumstances under which the will was executed and the fact that it cuts off all relatives and leaves all the property to a stranger who was known to the decedent for only a few weeks, it must be held that the burden of proof as to mental capacity has not been sustained by the proponent.

The evidence offered by the proponent as to statements made by the decedent after the execution of the will and in favor thereof is not sufficient to establish volition on the date that the paper was executed.

It must be held as a matter of law that fraud and undue influence were perpetrated upon the decedent by the proponent in securing the execution of the alleged will, in view of the circumstances recited above and also in view of the fact that the proponent procured the execution of powers of attorney in her favor and shortly thereafter removed the decedent from her home and kept her in nursing homes from that time until the time of her death, where she was under the absolute control of the proponent; and that the proponent gave false instructions to at least one nursing home that decedent's attorney prohibited any one calling on the decedent; and at all times kept the alleged will in her possession.

Surrogate's Court, Westchester County, March, 1924.     [Vol. 122

Proceedings to probate a will.

*Samuel F. Swinburne*, for proponent.

*Dunlap & Otto (Walter G. C. Otto,* of counsel), for contestants.

Slater, S. This is a contest of an alleged will of the testatrix had before the court without the aid of a jury upon framed issues relating to the execution of the will, mental capacity of the decedent, fraud and undue influence.

The proponent is one Mary Alice Lansley, who offered for probate the alleged will dated October 2, 1923. The contestants are a sister and a niece. The real question is whether the will is the will of the testatrix, or the will of Mary Alice Lansley, the sole beneficiary. Is it the valid testamentary wish of the decedent, or the result of a wrongful endeavor?

The decedent was the eldest of a family of one brother and three sisters who lived in New Rochelle for many years. They were of Spanish extraction. A brother and sister predeceased leaving children. The title to the home is in the decedent's name and valued at about $6,000. The lot had been paid for by contributions from members of the family. There are bank deposits of about $5,000, as well as deposits held in trust, for the surviving sister of about $2,500. Euphemia, the surviving sister, and the decedent lived together in the home. They were unmarried and elderly people, Euphemia being seventy-three years of age, and the decedent being eighty-four years of age. The decedent before her latter days had been engaged in the business of making the American flag, and thus acquired her property. Euphemia assisted and was the housekeeper. For four years prior to her death, which occurred on November 11, 1923, the decedent had been confined to her bed by an illness that produced muscular contraction of the legs and arms. During the month of August, 1923, the sole beneficiary of the will, Mary Alice Lansley, appeared on the scene, visited and conversed with the neighbors, alleged she was connected with a city board doing welfare work and said she would become interested in, and care for the old people. This she did. She was assiduous in her attention for a few subsequent weeks to the little feeble old lady, who had laid in bed for four weary years. She was an absolute stranger to the neighbors, as well as to Euphemia, the sister, and a niece, Mrs. Booth. She had never called before. She was not a relative. She was not even of Castilian blood. She had a home of her own in New Rochelle; and made visits day and night upon the decedent.

Were the services rendered charitable or mercenary? In the

early part of September she consulted a lawyer with the specific purpose of drafting powers of attorney to be executed by the decedent, wherein she was to become the attorney in fact with authority to draw upon the sums deposited in three several local banks. On October 1, 1923, we find the stranger meddling with the testamentary affairs of the decedent. This sole beneficiary visited a highly respectable and able attorney in the city of New Rochelle and at Miss Lansley's request he drew a will for the decedent, without direction from, consultation with, or observation of Miss Alfaya. The court ascribes no improper motive to the attorney. Miss Lansley evidently had in her possession a former will of the decedent dated July 21, 1921, indicated by the testimony of the attorney. It was offered in evidence. The sister Euphemia was remembered by a gift of the money held in trust for her. The rest of the property was given according to directions left in a memorandum referred to in the will. The court asked the attorney who directed him regarding the drafting of the new will and especially with relation to paragraphs 2 and 3 of the will, which are as follows:

" *Second.* In view of the fact that my sister who is my only near relative has means as ample as my own and is now an elderly woman, I have decided not to make any provision for her in this my will.

" *Third.* I give, devise and bequeath all the rest, residue and remainder of my estate, real, personal, or mixed and wheresoever situated, of which I shall die seized or possessed unto my friend Mary Alice Lansley, in appreciation for the many kindnesses she has always shown me."

The attorney testified that Miss Lansley had directed him as to its entire contents. True. He prepared the will as Miss Lansley told him. Proof is lacking that the decedent had directed Miss Lansley to perform this service. See dissent by Judge Gould in *Delafield* v. *Parish,* 25 N. Y. 9, 77. On the following morning, October second, he sent the prepared typewritten will addressed to Miss Lansley, at the home of the decedent. That same day Miss Lansley telephoned to one Harry T. Davis of New Rochelle, and asked him to come to the house of the decedent to act as a witness to a will. She called for him in a taxicab that afternoon, and took him to the home of the decedent, where she produced the will. The decedent, the witness Davis says, was in bed; she signed it in his presence, declared to him that it was her will and asked him to become a witness. No one was present, except the decedent, the witness Davis and Miss Lansley. The sister Euphemia, the natural object of testatrix's bounty, who lived in the home, and

was then present in the home, was not informed that a will was being executed and she, of course, was not invited to participate. He thereupon signed his name as a witness and handed the will to Miss Lansley. Either on the same day, or the following day (the witness was not sure), the then attending physician, Dr. Reardon, was asked to act as a witness to the will by Miss Lansley. He treated the decedent at Miss Lansley's request. She again produced the will. He testified that he asked the decedent whether the signature already affixed to the paper writing was her signature. She said it was. She also said it was her will and she asked him to become a witness. At this time no one was present, except the decedent, the witness Dr. Reardon, and Miss Lansley. The attestation clause, later signed at the office of the witness Davis, has no use, nor force, presumptive or otherwise. It was not read at the time of the execution, nor observed. It is a misstatement, as disclosed by the narrated facts. *Matter of Turrell*, 28 Misc. Rep. 106, 109; affd., 47 App. Div. 560; 166 N. Y. 330; *Matter of Kunkler's Will*, 147 N. Y. Supp. 1094.

Each time after the witnesses had signed, the will was handed to Miss Lansley as its custodian. The will was not read to the decedent in the presence of either of the witnesses. The will was produced by Miss Lansley and offered for probate in January, 1924. *Matter of Van Den Heuvel*, 76 Misc. Rep. 137, 167; *Matter of Jacobs*, Id. 394. It was not shown to have been with the decedent at any time, except for signature. This is not a will drawn in the open and above board by a lawyer of decedent's own choosing and with the knowledge of her people.

There is no proof that the decedent was able to read on October 2, 1923. There is no evidence that she knew or approved of the contents of the instrument signed by her. She did not direct or order it to be drafted. There was no attempt made to prove that there was any conversation with the decedent regarding the contents of the paper, or its terms, or provisions, before she signed it. No explanation is offered as to why the propounded paper disinherited those dependent and remembered in a prior will, executed by a testatrix suffering great bodily weakness, and in favor of a stranger. *Matter of Regan*, 206 App. Div. 403; *Matter of Carter*, 199 id. 405, 422; *Tyler* v. *Gardiner*, 35 N. Y. 559; *Seaman* v. *McLaury*, 134 App. Div. 180; *Matter of DeCastro*, 32 Misc. Rep. 193. There is no proof that after the date of the will the testatrix had an opportunity to perform a deliberate and intentional testamentary act, free from the control of Miss Lansley.

On October sixth the attorney drafted a power of attorney, which he had been consulted about early in September, with

carbon copies, one for each of the banks holding decedent's deposits. After the will had been thus obtained Miss Lansley secured the execution of the powers of attorney and presented them to the banks and funds were withdrawn from each bank. ·Neither had the attorney direction from the decedent to draft these papers. It was again the act of Miss Lansley. Relying on the will the proponent assumed she could go to any length in the use of decedent's money. This act bears directly upon her intent and whether the decedent's mind was controlled by Miss Lansley.

In a case of this kind, under the conditions as narrated, there must be something more than the mere fact that the testatrix signed her name to the will and published it. An explanation is demanded. It is not forthcoming. It requires of the proponent some proof in addition to that which will ordinarily suffice. 1 Davids Law of Wills, §§ 201, 203, 213, 222; *Matter of Gannon*, 73 Misc. Rep. 325; *Peck* v. *Belden*, 6 Dem. 299; *Matter of Gedney's Will*, 142 N. Y. Supp. 157. The reason for the necessity of the explanation is developed by proof of facts recognized in law as being indicative of intervention and a subversion of the volition of decedent. The proponent's proof lacks explanation. In the case of persons who are ill, or otherwise disabled, as well as in cases of illiteracy, there is no presumption that the testator knew what he was doing, but the knowledge of the contents of a will and the character of the paper have to be proven. There was the ordinary proof of the *factum* of the will, but in this case the proponent is required to show affirmatively that the testatrix had an intelligent knowledge of the contents of the will, which has not been shown by the evidence of the two witnesses to the will, and in fact by no other witness. The court cannot assume that something was read to her. There must be proof that the instrument offered was read to her, that she knew its contents, or that it expressed her intention. *Matter of Bedell*, 107 App. Div. 284. Proponent was not prepared with this proof and probate must be denied. *Matter of DeCastro*, 32 Misc. Rep. 193. The proponent is bound to show affirmatively as a condition of probate that the testatrix had an intelligent knowledge of the contents of the will. *Rollwagen* v. *Rollwagen*, 63 N. Y. 504; Jessup Surr. 480, 482. The circumstances require evidence to show that the will was the free, untrammelled expression of the wishes and intention of the testatrix and no such evidence appears. *Matter of Rintelen*, 77 App. Div. 142. It requires evidence that the decedent understood the contents of the will as its provisions vary from decedent's previous intention. *Matter of Kenney*, 179 App. Div. 258; *Evans* v. *Trimble*, 169 id. 363; appeal dis., 217 N. Y. 701. The contrast between the two

wills is striking. The short time between the arrival of the maker and the will making is noticeable.

The court must be satisfied of the genuineness of the will and the validity of its execution. It is not satisfied that the will is genuine (Surr. Ct. Act, § 144) or that the testatrix signed a paper writing which she understood was to take the place of her will that she had executed two years or more before. The provision with reference to the sister is untrue. She had nothing, except the funds held in trust for her, which trust was revocable in character. The failure to remember the sister is explained by a false statement. Neither does the 3d paragraph speak with exactness when the draftsman refers to " kindnesses she has *always* shown me." Five weeks only elapsed between the first call and the success of the venture. Too short a time intervened and out of all proportion to the value of the gift. The court is not convinced that the instrument speaks the language and expresses the will of the decedent. In fact, from the testimony of the attorney it was the language of Miss Lansley. He says so. It must be considered the act of Miss Lansley and not the act of Theresa Alfaya. The attorney did not act for, neither was he paid for the service by the testatrix, neither did he consider himself acting as attorney for Miss Alfaya. The proponent writes herself heir *Qui se scripsit haeredem*, and her burden of proof is enlarged. *Delafield* v. *Parish*, 25 N. Y. 9, 35. The will was not fairly made; it is unnatural and unjust. *Matter of Budlong*, 126 N. Y. 423, 432.

I have reached the conclusion that the issues relating to the execution of the will must be decided in favor of the contestants, because the will does not speak the word, nor is it the will of the testatrix. There is an entire absence of evidence that the woman knew the contents of the document. The burden cast upon the proponent has not been met and grave doubts in my mind remain unremoved. *Matter of King*, 89 Misc. Rep. 638, 649, and cases cited; *Matter of Hermann*, 87 id. 476, 502.

The evidence indicates that the mental capacity of the decedent was impaired. Three different physicians of New Rochelle, duly licensed examiners in lunacy, testified that they had attended her upon the following dates, viz., September, 1922; February 26, 1923; spring of 1923; August 20, 1923. They all testified that in their opinion the decedent was mentally incompetent to make a will because she was suffering, as one said, from senile dementia, and another from arterio sclerosis, and they found her in a condition of mental incapacity. One lay witness testified that at times the decedent was perfectly rational and at times she was irrational. She was eighty-four years old, a weak, feeble, dependent

and bed-ridden old woman.   She may have had intelligence enough at times to make a will if left entirely alone.   Three doctors say she was incompetent.   The attending physician, witness to the will, testified she was competent.   The evidence presents a question of fact upon that subject.   It is evident she was not able to make a will without the assistance of some real friend who could advise her.   The propounded paper cuts off all relatives and leaves all the property to a stranger of a month's duration, who was unknown and unheard of by the family before August, 1923.   The burden of proof as to mental capacity has not been sustained by the proponent.   *Matter of Prentice,* 110 Misc. Rep. 456, 471, and cases cited.

The evidence offered by proponent as to statements made by the testatrix after October twentieth in favor of the will are not sufficient to establish volition on the date of the paper writing. 1 Davids Law of Wills, § 246; *Matter of Strong,* 179 App. Div. 539.

As to the issue of fraud and undue influence.   Undue influence is a specie of fraud.   *Matter of Smith,* 95 N. Y. 516, 522.   Fraud is conduct inconsistent with fair dealing and good conscience.   I have heretofore set forth some of the facts adduced by the testimony. Every act is the act of Miss Lansley.   At the end of September, 1923, she called upon Mrs. Wilton, the proprietress of a sanitarium, and had a talk with her regarding the removal of the decedent and said:   " She has to have more care, and I have power of attorney to do all I want, but I cannot move her until I have gotten her to make a will."   Then Mrs. Wilton said:   " Are you doing this for nothing?   Is the will going to be in your favor? " She said:   " I guess so."   The testatrix was caught in the meshes of a person who had no claim upon her bounty.   Such a fraud becomes coercion, which is the essence of undue influence.   *Matter of Fleischmann,* 176 App. Div. 785.   It was exercised at the very testamentary act, and the will did not express the real will of the testatrix.   The will was not drafted by a lawyer freely chosen. And we have " a surmise, or conjecture " by reason of her feebleness, and dependency.   1 Davids Law of Wills, 181; *Matter of Ruef,* 180 App. Div. 203; affd., 223 N. Y. 582.

Soon after the powers of attorney had been procured, money was withdrawn from the bank for the purpose of placing Euphemia in a home, but this failed, and Theresa, the old weakened soul, was taken from the home by Miss Lansley, never to return.   She was taken from one nursing home to another by Miss Lansley in quick succession.   Because of her continuous screams and tirades, the proprietresses would not keep her.   While at Mrs. Wilton's place,

Surrogate's Court, Westchester County, March, 1924. [Vol. 122

Miss Lansley gave orders, as coming from the attorney, that the testatrix was not to be seen by any one who called. The attorney denied giving any such orders. On October twentieth she was at her last earthly place of abode where she lived for three weeks and passed on.

The intrusion of this stranger into the family was a premeditated effort, in my opinion, to secure the estate of the testatrix. The will was Miss Lansley's will. Her charitable aid and her mesmeric influence were as deadly as a reptile's overpowering charm. She prepared the will. It was never out of her possession until it reposed in a public office. She produced the two disinterested witnesses. It was signed in her presence, and under her controlling influence by a feeble old woman at the best only competent at intervals. Did her mind control in the making? Does the earth revolve? The proponent gave instructions for its preparation, superintended its execution, selected the witnesses, employed the draftsman. There is " affirmative evidence " of the facts from which undue influence is to be inferred. The circumstances of the testamentary act justify a finding of the exercise of undue influence. *Matter of Powers*, 176 App. Div. 455.

I find as a fact and as a matter of law that fraud and undue influence were perpetrated upon the testatrix by the proponent in securing the paper writing offered for probate. The continuing burden of this issue which was upon the contestant has been sustained. *Darley* v. *Darley*, 3 Bradf. 481, 507; *Matter of Smith*, 95 N. Y. 516; *Matter of Kindberg*, 207 id. 220; *Matter of Jones*, 199 App. Div. 426, 431; *Matter of King, supra; Matter of Williams*, 89 Misc. Rep. 1, 12; *Matter of Cohen*, 106 id. 644; *Matter of Hermann*, 87 id. 476, 501; *Tyler* v. *Gardiner, supra; Evans* v. *Trimble, supra; Matter of Moon's Will*, 8 N. Y. Supp. 86; *Chambers* v. *Chambers*, 61 App. Div. 299, 311.

The motion of the proponent for probate of the will is denied. The motion of the contestant to deny probate is granted. An order may be entered denying probate to the propounded paper writing.

*Decreed accordingly.*