In the Matter of the Estate of CLAUDE H. LASHER, Deceased.

Surrogate's Court, New York County, December 17, 1937.

*Vollmer & Wildermuth [Henry Vollmer, Jr.,* of counsel], **for the** petitioner, proponent, Harrison Rockefeller, first cousin, sole legatee.

*Appell & Appell [Cyrus W. Lunn* of counsel], for the contestant, Henry O. Rockefeller, first cousin.

*Alphonse G. Koelble,* special guardian for Libbie Amsted, an incompetent.

FOLEY, S. In this contested probate proceeding, tried by the surrogate without a jury, the grounds of attack upon the validity of the alleged will were defective execution, lack of testamentary capacity and undue influence. The will bequeathed the entire estate to a cousin of the testator, Harrison Rockefeller, and named him as executor. The contestant is also a cousin.

The propounded paper bears the date April 24, 1937. The testator died about two months later on June 22, 1937. His exact age is in doubt. The death certificate sets forth that he was seventy-six years old. On the other hand, he informed one of the witnesses that he was eighty-six years of age. He left an estate which amounted to the sum of $3,000. There is an additional asset, over which dispute has arisen, consisting of a savings bank account of $3,000 originally in the name of the decedent, but transferred by him on April 30, 1937, shortly after the alleged date of the will, into a new account in the joint names of himself and the sole beneficiary named in the will, with provision for payment to the survivor.

The circumstances surrounding the preparation and execution of the will are exceptional. Mr. Rockefeller, the sole legatee, testified that the instructions as to its contents were given to him by the testator. He then went to the office of his son-in-law,

an attorney in Jamaica, Long Island. The evidence shows a casual discussion between the two as to the contents of the will. The attorney had never met the decedent. He gave general instructions to his stenographer as to its preparation. He testified that he was at that time familiar with the warning of Judge CRANE in *Matter of Putnam* (257 N. Y. 140), that an attorney who drafts an instrument in which a relative of his is given a bequest " would do well to have the will drawn by some other lawyer." The stenographer typed the draft of the will under the supervision of the sole legatee and without further direction from the attorney. The attorney did not attend upon the execution of the will. After the draft had been typed, the will was immediately taken by the sole legatee to the home of the decedent for the purpose of execution. One of the subscribing witnesses was a neighbor who lived in the same house and who prepared the meals for Mr. Lasher. The other was her husband. The maxim *qui se scripsit haeredem,* or the rule of scrutiny that must attach to the conduct of a person who has written himself into a will as a legatee, therefore, applies here with special force because of the independent proof of impaired mind and volition of the decedent. (*Delafield* v. *Parish,* 25 N. Y. 9; *Matter of Alfaya,* 122 Misc. 771.) The sole beneficiary was present during the entire transaction and supervised the execution of the instrument by which, if valid, he would have obtained the entire estate. There are contradictions in the testimony of the subscribing witnesses as to the manner of execution, but their testimony when considered liberally, permits of the inference that the legal requirements of execution were testified to. Extreme doubt, however, has arisen as to when the alleged will was executed. One of the subscribing witnesses testified at first that she believed that it took place on April 23, 1937, and not upon April 24, 1937, the date appearing on the alleged will. An inspection of the document itself shows that the date had been altered and that when it was originally typewritten it was dated the 3d day of May, 1937. No satisfactory explanation of the change of date has been given either by the sole legatee or by his son-in-law, the attorney. The story of the former is that he took the instrument, after execution, to a stenographer employed in his office. She erased the original date and typewrote over it the date now appearing upon the paper. This stenographer did not testify upon the trial. The change of date, however, has extreme significance. If the alleged will was prepared, as stated by those testifying in favor of it, upon the day of its execution, and the stenographer in the regular course typewrote that date in the instrument, it was executed on the 3d day of May, 1937, or at some subsequent date and not in the month of April. The form of the alleged

will admits of no possibility of a casual clerical error as to the day of the month or the name of the month itself. The mental and physical condition of the decedent was rapidly deteriorating in this period and motive for the dating back of the instrument to an earlier date than that upon which it may have been actually signed is clearly demonstrated.

On the issue of testamentary capacity it has been shown that on the day before the alleged execution of the will Mr. Lasher was visited by a physician for the purpose of treatment. He was found to be suffering from general arteriosclerosis, a coronary heart condition and high blood pressure. The physician testified that the decedent was not oriented, that he made no responsive answers to questions asked him and that he was of unsound mind on that date and was suffering from senile dementia. Other persons have testified that he suffered from loss of memory and that his personal habits and appearance were careless and filthy, and his eyesight greatly impaired. The signature upon the instrument is a mere scrawl and is almost undecipherable. He had delusions that crocodiles, alligators and snakes were in the room occupied by him and he could not be reasoned out of these delusions. Although his room was lighted by gas and contained no electrical equipment whatsoever, he frequently complained to various witnesses that a live electric wire was strung near his bed and endangered his life. On May 4, 1937, he was examined briefly by an ambulance doctor called from St. Vincent's Hospital. That physician was of the opinion that he was senile but not incompetent although the decedent told him that persons were attempting to railroad him to a hospital. Some weeks later he was found dead in his room, a victim of a heart attack. The evidence submitted by the proponent on this issue is unsatisfactory and unconvincing. Upon a review of the entire evidence upon the issue of capacity the court finds that the testator was not of sound mind on the 24th day of April, 1937, or on any subsequent date up to the time of his death.

The conclusion also follows from the evidence that the alleged will was procured by the undue influence of the sole legatee. The picture presented by the evidence is that of an aged man whose mental state and physical condition were greatly impaired and weakened and one easily subject to the influence of a designing person seeking to obtain his property.

There is another important element in the case. The claims of Mr. Rockefeller, the sole legatee, that the will was duly executed and that the testator was of sound mind and free from undue influence were gravely impeached by his own conduct after the death of Mr. Lasher. He was confronted with an affidavit which

he had signed to induce the attorney for the State Tax Commission to give a waiver required by the Tax Law in order to release the moneys on deposit in the joint account in his name and in the name of the decedent. It was executed a few days after Mr. Lasher's death. The false statements contained in that affidavit he at first attempted to explain were due to the fact that it was prepared by a clerk in a bank without special information supplied by the proponent. On the other hand, it was conclusively shown to have been prepared, signed and sworn to by him in the office of the State Tax Department, New York county. The questions embodied in it were submitted to him by an experienced waiver clerk employed there for some years. Despite Rockefeller's personal supervision of the preparation and execution of the alleged will and the fact that he knew it was then in the possession of his son-in-law, his attorney, he was there asked the question and gave the following answer: " Q. Did the decedent leave a last will and testament? A. No." Moreover, despite the fact that he knew that he had been appointed executor in the alleged will and that he was, according to his version, about to file the will for probate, he was asked the further question and gave the following answer: " Q. Is it the intention of the persons interested to have an executor or administrator appointed for the decedent's estate? A. No."

It is reasonably inferable from these answers of the proponent either that the alleged will was never executed in the lifetime of the decedent or that serious doubt existed in the proponent's mind as to its validity because of the alteration in its date, or that it never could be probated because of the mental infirmities of Mr. Lasher or because of the coercion or duress which were employed in its procurement. The conduct of the proponent with the other factual proof constitutes the strongest form of admission that the paper never had any validity.

Upon all of the evidence the surrogate, as the trier of the facts, finds that the contestant has sustained the burden and established that the will was the result of undue influence exercised by the proponent and sole legatee. (*Matter of Anna*, 248 N. Y. 421; *Matter of Budlong*, 126 id. 423; *Matter of Smith*, 95 id. 516; *Tyler* v. *Gardiner*, 35 id. 559; *Eckert* v. *Page*, 161 App. Div. 154.)

The will is denied probate. Tax costs and submit decree on notice accordingly.